Raymond OLIVAS, Appellant

v.

The STATE of Texas.

Nos. PD–1933–04, PD–1934–
04, PD–1935–04.

Court of Criminal Appeals of Texas.

Sept. 13, 2006.

138

Stephen Gustitis, Bryan, for Appellant.

Douglas Howell, III, Asst. Dist. Atty., Bryan, for State.

## *OPINION*

COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., PRICE, WOMACK, JOHNSON, KEASLER, HERVEY and HOLCOMB, JJ., joined.

Four times, in less than a month, appellant evaded arrest by outracing Bryan or College Station police officers who were attempting to arrest him for stalking and assaulting his former girlfriend. A jury convicted appellant of all four evading arrest charges, and it found that he used his mother's Pontiac Bonneville as a deadly weapon during three of those offenses. The court of appeals rejected appellant's claims of legal and factual sufficiency, but it then found unassigned, fundamental, "structural" error in the jury charge be-

cause the special issue did not explain that the State had the burden to prove, beyond a reasonable doubt, that appellant used his mother's car as a deadly weapon.[1] The court of appeals reversed the judgment in the three evading arrest cases that contained deadly weapon findings and remanded those cases for a new trial. Finding that the unobjected-to error in the jury charge did not cause appellant "egregious harm" under *Almanza*,[2] we reverse the court of appeals and affirm the trial court's judgment.[3]

## I.

Kim Tunnell, married with two children, had an affair with appellant. She broke off this relationship to save her marriage, but appellant did not want to end the affair. He constantly called Ms. Tunnell's cell phone, leaving voice messages first of love, then of anger, and finally of threats.

On November 27, 2001, Ms. Tunnell received a voicemail message in which appellant told her that if she didn't come out of her house, he would break the door down. Fearing violence, Ms. Tunnell decided to ask the police for help. She recorded the 59 voice messages that appellant had previously left. While she was doing so, appellant called again and told Ms. Tunnell to "count her friggin' hours."

She went to the Bryan Police Department office, reported the telephone harassment, and left the recorded messages with them. At the suggestion of the police, Ms. Tunnell then went to her attorney's office to obtain a restraining order against appellant. As she pulled into the attorney's parking lot, she saw appellant walking "briskly" toward her truck. She began to back out of the parking lot, but, as appellant reached the passenger side of the truck, he pulled out a pistol and "tried to break the passenger side glass." The window did not break, but Ms. Tunnell, who had never seen appellant with a gun before, fled in her truck. Eventually, she drove back to the attorney's office, and he called the police.

Motorcycle Officer John Agnew responded to that call, got a description of the car appellant was driving, and soon saw that car, a beige Pontiac Bonneville registered to appellant's mother, at the Tobacco Barn, a nearby gas station. The driver of the Pontiac saw Officer Agnew behind him, so he got into the car and "immediately started rolling." Officer Agnew followed, turning on his lights and siren as the driver picked up speed. The Pontiac went into the oncoming traffic lane as its driver cut around a sharp curve trying to escape. Once around the curve, the "vehicle just punched it, just took off as fast as it could down MLK" Street. The driver was going a minimum of 50 m.p.h. in a 30 m.p.h. zone. Officer Agnew knew that he needed to stop the Pontiac "quickly before someone gets hurt." The driver again swerved into the oncoming traffic to pass another car in his lane. Officer Agnew testified that the Pontiac, being driven in this manner and at that

---

1. *Olivas v. State,* 153 S.W.3d 108, 118 (Tex. App.-Waco 2004).

2. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim.App.1985) (op. on reh'g).

3. We granted three of the four issues raised by the State in its Petition for Discretionary Review:

1. Did the Court of Appeals err in finding that the charge error was immune from harm analysis?
2. Did the Court of Appeals incorrectly apply the egregious harm analysis of *Almanza* and err in concluding that the error was egregious?
3. Did the Court of Appeals err in applying the harm analysis found under Tex.R.App. P. 44.2(a)?

speed, "was definitely capable of causing serious bodily injury to somebody." Officer Agnew discontinued his pursuit because the Pontiac was "getting way too fast" for him on his motorcycle.

On December 12th, as Ms. Tunnell was driving to the laundromat, appellant drove up behind her in his mother's Pontiac and she heard two "pop" sounds as he pulled the Pontiac up alongside her truck. She called the police on her cell phone as soon as she arrived at the laundromat and discovered a fresh bullet hole in the driver's side of the extended cab. Officer Alvarez responded and found Ms. Tunnell crying and "stomping around" in anger and fear. She told Officer Alvarez that appellant had tried to shoot her. Officer Alvarez examined the truck and found that the bullet had penetrated the truck; he found the bullet fragments in a blanket on the seat. After completing his investigation, Officer Alvarez returned to the police station, but he was soon notified that appellant had called Ms. Tunnell again, this time from a pay phone at a local store, Sloppy Joe's.[4] Officer Alvarez got back into his patrol-car and was headed toward Sloppy Joe's when he saw the Pontiac pass him. He pulled in behind the Pontiac, turned on his patrol-car video recorder, and called for additional units to stop the car. The Pontiac turned into the same Tobacco Barn gas station where Officer Agnew had first spotted it two weeks earlier. Once Officer

Alvarez turned on his lights to make a stop, the Pontiac accelerated, went around the building and through the parking lot at a high rate of speed, and then turned onto MLK Street. Officer Alvarez followed, with the video camera recording the chase, but the Pontiac soon outdistanced the patrol car and disappeared around a corner.

Nine days later, on December 21st, Officer Alvarez learned that appellant was going to be at the Brazos Inn that evening. He, along with two other officers, staked out that location. At about 10:30 p.m., they saw appellant enter the Inn; after a few minutes he left. Appellant got into the same Pontiac that Officer Alvarez had followed and videotaped nine days earlier. Appellant turned onto Highway 6, traveling south. Officer Alvarez and two other officers, all in separate patrol cars, came up behind appellant's car, turned on their emergency lights, and attempted to pull him over. At first appellant slowed down, and pulled over to the right, then he suddenly veered back left and accelerated to at least 95 to 100 m.p.h., leaving the three patrol cars far behind. The officers backed off for safety reasons because they did not want to cause appellant to hit someone. They saw him cut across the grassy median, make a U-turn and start back northbound, making both a northbound mini-van and another car stop in the middle of the highway to avoid a collision. Then, as the patrol cars started to follow,

4. Before calling Ms. Tunnell from Sloppy Joe's, appellant had called her from a phone located at 5065 Enchanted Oaks Drive, appellant's mother's home. When Ms. Tunnell told the police about this call, Officer Emig was dispatched out to the house. As he drove up, he saw a car turn on its headlights in the driveway. Officer Emig parked his car in front of the driveway, so the other car drove through the yard and over a culvert; then it sped off. Officer Emig turned on his overhead lights and started to pursue what he then saw was a Pontiac Bonneville. Although

he reached speeds close to 70 m.p.h., the officer could not catch up and soon lost the Pontiac in the fog. About an hour later, Officer Emig received a dispatch that appellant had called Ms. Tunnell yet again from the Wixon Valley Country Store, so the officer drove in that direction. He saw a car that looked like the one he had pursued earlier in the evening coming toward him right behind a slow-moving truck. Officer Emig turned around to follow, but the Bonneville passed the truck in a no-pass zone and once more sped off.

appellant made yet another turn across the highway, through the southbound lanes, and over a grassy embankment. He pulled onto the frontage road, driving the wrong way. When he came to the intersection, he maneuvered around at least one car and then turned left on University Drive. Officer Alvarez said that the Pontiac was being driven in such a reckless, careless, and aggressive manner that it was capable of causing death or serious bodily injury. Another officer testified that at the speed appellant was driving his "vehicle could become a missile, an object if one loses control; whether it's by trying to exit [or] rear-end another vehicle at a high rate of speed."

On December 24th, Christmas Eve afternoon, Ms. Tunnell reported to the police that appellant was again following her in his mother's car. The dispatcher told her to come to the College Station Police Department. Officer Wiesepape, who had been dispatched to investigate, saw Ms. Tunnell's car as she started to pull into the police department parking lot. Appellant's car was right behind her, but he did not pull into the parking lot. When appellant looked into his rear view mirror and saw Officer Wiesepape driving behind him, he cut across the traffic lanes and into the Taste of China parking lot. He stopped his car, but when Officer Wiesepape also stopped, got out of his patrol car, and started toward the Pontiac, appellant put the car into drive, jumped the curb, drove down a grassy embankment, jumped the curb on the other side of the embankment, and landed back on the road. Appellant "blew" the stop sign without touching his brakes. The oncoming traffic had to stop suddenly. According to Officer Wiesepape, if those cars had not stopped, there would have been an accident. Officer Wiesepape ran back to his car and drove off in pursuit (although he did stop at the stop sign that appellant had run through be-

cause the traffic was still blocked by the cars that had stopped for appellant) down Texas Avenue. Appellant had disappeared once more.

Officer Vick heard his fellow officer's "chase in progress" dispatch and saw appellant's car pass by him, traveling at 70–80 m.p.h. in a 45 m.p.h. zone. Officer Vick immediately put on his lights and siren, turned around and started to pursue appellant who continued to accelerate. Appellant ran two more stop signs without braking, and, once again, he disappeared.

Appellant was finally arrested on December 27th, when Ms. Tunnell, at the behest of the police, set up a meeting with appellant at the Culpepper Plaza. Appellant had arrived on a bike. When the police approached and ordered appellant to the ground, he jumped back on his bike and rapidly rode off. The police finally surrounded him as he was riding down a ditch. He told the officer who drove him to jail that if he had been in a car, they never would have caught him. "Police are pussies and they can't catch shit."

In a consolidated trial, a jury convicted appellant of stalking, aggravated assault by threat, and the four evading arrest incidents. The jury also found that appellant had used his mother's Pontiac Bonneville as a deadly weapon during three of the evading-arrest incidents.

Appellant brought two points of error on appeal—legal and factual sufficiency to support the four evading arrest convictions. He argued that the officers could not identify him as the driver of his mother's car. The Waco Court of Appeals rejected these claims, but reversed three of appellant's convictions based on what it called "fundamental charge error" even though appellant had never raised such a

claim either in the trial or appellate court.[5] It stated that the trial court had "charged the jury at the guilt-innocence phase on the deadly weapon issue by asking an extra question on the verdict form after the jury had determined whether Olivas had evaded arrest using a vehicle."[6] The court concluded that (1) "the [trial] court did not properly place the burden of proof regarding the deadly weapon issue on the State";[7] (2) "the charge did not require that the jury make the finding that Olivas used a deadly weapon 'beyond a reasonable doubt' ";[8] (3) this error was "structural" and immune to any harmless-error analysis;[9] (4) if the error was subject to a harmless-error analysis, it caused appellant egregious harm under *Almanza*;[10] and (5) it was harmful constitutional error under Tex.R.App. P. 44.2(a).[11] Chief Justice Gray dissented and stated: "There is no fundamental error in the charge without egregious harm."[12]

## II.

The United States Supreme Court has held that a jury charge which misdefines the State's burden of proof as being less than beyond a reasonable doubt constitutes structural error.[13] It is never

5. *Olivas*, 153 S.W.3d at 113.

6. *Id.* at 114–15. The special issue was set out on the one-page verdict form, immediately below the "guilty" verdict form. It read:

Answer the Deadly Weapon Question only if you have found the defendant guilty. Otherwise do not answer the Deadly Weapon Question.

DEADLY WEAPON
WE, THE JURY, find the defendant, RAYMOND OLIVAS, **did use** a deadly weapon during the commission of the offense alleged in the indictment.

PRESIDING JUROR
WE, THE JURY, find the defendant, RAYMOND OLIVAS, **did not use** a deadly weapon during the commission of the offense alleged in the indictment.

PRESIDING JUROR

7. *Id.* at 115.

8. *Id.*

9. *Id.* at 117. The court of appeals also held that the deadly weapon issue was improperly submitted during the guilt stage of the trial. *Id.* at 116–17. That issue is not before us, but we note that the deadly weapon issue has been submitted in this manner in other cases. *See Goodrich v. State*, 156 S.W.3d 141, 148 (Tex.App.-Dallas 2005, pet. ref'd) (stating that "in this case, at the guilt phase, the jury found appellant used or exhibited a deadly weapon; thus, under section 12.35(c)(1), the punishment range for the offense was that of a third

degree felony"); *Bunton v. State*, 136 S.W.3d 355, 362 (Tex.App.-Austin 2004, pet. ref'd) (stating, "At the guilt/innocence stage of the trial, the trial court submitted to the jury the state jail felony offense … and a special issue as to whether appellant used a deadly weapon, a motor vehicle, in the commission of the offense").

10. *Id.* at 117 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984)).

11. *Id.* at 117–18.

12. *Id.* at 118.

13. *Sullivan v. Louisiana*, 508 U.S. 275, 281–82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (jury instruction was "essentially identical" to that disapproved in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (*per curiam*)). The instruction in *Cage* equated "a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,' and stated that what was required was a 'moral certainty' that the defendant was guilty." 498 U.S. at 41, 111 S.Ct. 328. The Supreme Court held that the instruction suggested "a higher degree of doubt than is required for acquittal under the reasonable-doubt standard" and that "a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Id. See also Sullivan*, 508 U.S. at 280, 113 S.Ct. 2078 (stating that, if there is "no jury verdict of guilty-beyond-a-reason-

harmless-error.[14] "[A] constitutionally deficient reasonable doubt instruction is a breed apart from the many other instructional errors that [the Supreme Court has] held *are* amenable to harmless-error analysis."[15] However, as the Supreme Court has recently reiterated, a jury instruction "that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."[16] Thus, structural error goes to a complete mis-direction or failure to instruct on the reasonable doubt standard, but a failure to instruct the jury on one element of an offense or a failure to submit a sentencing issue to the jury under *Apprendi*[17] is not structural error; it is subject to a harmless-error analysis.[18] If omitting an element *entirely* from the jury charge is not

structural error, it naturally follows that the failure to instruct the jury on the State's burden of proof regarding one element of an offense (or on a sentencing issue) is not structural error.[19]

■ This Court uses the same rule as the Supreme Court regarding erroneous jury instructions relating to reasonable doubt, except that Texas courts apply the specialized harmless-error analysis set out in *Almanza v. State* for "partial" reasonable-doubt errors:

> if there is a total omission of the instruction on reasonable doubt, such error defies meaningful analysis by harmless-error standards. However, if the jury is given a partial or substantially correct charge on reasonable doubt, then any error therein is subject to a harm analy-

able-doubt, the question whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no *object,* so to speak, upon which harmless-error scrutiny can operate").

**14.** *Id.*

**15.** *Id.* at 284, 113 S.Ct. 2078 (Rehnquist, C.J., concurring) (emphasis in original).

**16.** *Washington v. Recuenco,* No. 05–83, —— U.S. ——, 126 S.Ct. 2546, 2552, 165 L.Ed.2d 466 (2006) (quoting *Neder v. United States,* 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). In *Recuenco,* the defendant was charged with assault with a deadly weapon, to-wit: a handgun. The jury found the defendant guilty and answered the special deadly weapon issue in the affirmative. It did not, however, specifically find that the deadly weapon used was a "firearm" which, under Washington law, calls for a mandatory three-year enhancement. *Id.* at 2549. The Supreme Court held that the prosecution's failure to prove the sentencing factor of "armed with a firearm" to the jury beyond a reasonable doubt was subject to harmless-error analysis. *Id.* at 2553. Similarly, in *Neder,* the Supreme Court held that the failure to submit the element of the "materiality" of a

false statement in the jury instructions in a trial for mail fraud, wire fraud, and bank fraud was subject to a harmless-error analysis. *Neder,* 527 U.S. at 9, 119 S.Ct. 1827.

**17.** *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (holding, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt").

**18.** *See United States v. Vazquez,* 271 F.3d 93, 98–103 (3d Cir.2001) (*en banc*) (collecting cases from the First, Fifth, Seventh, Eighth, Tenth, Eleventh and District of Columbia Circuits and holding that unobjected-to *Apprendi* error in failing to submit an enhancement issue to the jury was subject to "plain error" harmless-error review; rejecting defendant's argument that an *Apprendi* violation is a structural defect); *State v. Gordon,* 262 Wis.2d 380, 663 N.W.2d 765, 776–77 (2003) (collecting cases and stating, "*Neder's* harmless-error analysis has been applied to *Apprendi*-type errors in every single federal appellate circuit. In addition, several state appellate courts have also applied *Neder* to *Apprendi*-type errors") (footnotes omitted).

**19.** *See Recuenco,* 126 S.Ct. at 2553.

sis under *Abdnor*, *Almanza*, and TEX. CODE CRIM. PROC. art. 36.19.[20]

■ Under *Almanza*, a reviewing court uses different standards for analyzing jury-charge errors depending upon whether the defendant did or did not object at trial.[21] "A party is not excused from the procedural requirements for objecting at trial merely because an error involves a constitutional right."[22] Thus, when jury-charge error is not raised at trial, an appellate court may review that asserted (or, as in this case, unassigned) error, but a much greater degree of harm is required for reversal when the error is not properly preserved.[23] To be reversible, any unpreserved jury-charge error must result in "egregious harm" which affects "the very basis of the case," deprives the defendant of a "valuable right," or "vitally affect[s] a defensive theory."[24]

■ Under *Almanza*, reviewing courts should consider the following four factors:
1) the charge itself;
2) the state of the evidence including contested issues and the weight of the probative evidence;
3) arguments of counsel; and
4) any other relevant information revealed by the record of the trial as a whole.[25]

We note that several unpublished court of appeals's opinions have used this *Almanza* analysis when addressing whether this type of error relating to the deadly-weapon issue caused a defendant egregious harm.[26]

---

**20.** *State v. Toney*, 979 S.W.2d 642, 644–45 (Tex.Crim.App.1998); *see also Mann v. State*, 964 S.W.2d 639, 642 (Tex.Crim.App.1998) (plurality op.) (holding that "where an error in the jury charge on reasonable doubt or burden of proof is isolated to one portion thereof and the remainder of the jury charge contains language negating the erroneous portion thereof, the effect of the error is analyzed by employment of the standards set forth by this Court in *Abdnor* and *Almanza*, and which are based on Article 36.19").

**21.** *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex.Crim.App.1994). This Court explained:

The standard to determine whether sufficient harm resulted from the charging error to require reversal depends upon whether appellant objected. Where there has been a timely objection made at trial, an appellate court will search for only "some harm." By contrast, where the error is urged for the first time on appeal, a reviewing court will search for "egregious harm."
*Id.* at 731–32.

**22.** *Jimenez v. State*, 32 S.W.3d 233, 235 (Tex. Crim.App.2000).

**23.** *Almanza*, 686 S.W.2d at 171; *see also Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim.App.1996).

**24.** *Almanza*, 686 S.W.2d at 172; *Hutch*, 922 S.W.2d at 171.

**25.** *Hutch*, 922 S.W.2d at 171 (citations omitted).

**26.** *See Villanueva v. State*, 194 S.W.3d 146, 153–54, 2006 Tex.App. LEXIS 4957 *12–13 (Tex.App.-Houston [1st Dist.] 2006, n.p.h.) (rejecting defendant's contention that the failure to instruct the jury that the State had the burden to define "deadly weapon" and prove the deadly weapon issue beyond a reasonable doubt was "structural error" under *Sullivan v. Louisiana*; applying *Almanza* analysis and concluding that the defendant had failed to prove egregious harm); *Delgadillo v. State*, No. 08–01–00455–CR, 2004 WL 1375404, *11, 2004 Tex.App. LEXIS 5455 *29–31 (Tex. App.-El Paso 2004, pet. ref'd) (applying *Almanza* analysis to trial court's error in failing to include a "beyond a reasonable doubt" instruction as to the deadly weapon finding; concluding, "While the jury was not specifically instructed on the State's burden with respect to the deadly weapon issue, it was properly instructed on the State's burden of proof of beyond a reasonable doubt in the guilt-innocence phase of the trial and no other burden of proof was provided to the jury. Appellant has failed to show egregious harm resulted from the complained-of charge er-

## III.

■ In the present case, the "deadly weapon" issue did not explicitly incorporate the required beyond-a-reasonable-doubt burden of proof.[27] The State concedes that this was error, but contends that it was harmless-error under *Almanza.* Appellant and the court of appeals contend that this error was "structural" under *Sullivan* and therefore immune to any harmless-error analysis.

This was not structural error. The jury instructions did not totally omit any reference to proof beyond a reasonable doubt, nor did those instructions mis-direct the jury concerning that burden of proof. Instead, the instructions repeatedly told the jury that the State had the burden to prove every element of the offense beyond a reasonable doubt.[28] These instructions are not comparable to the misdirection on reasonable doubt found to be structural error in *Sullivan.* Instead, the failure to

explicitly set out the burden of proof in this deadly weapon special issue is analogous to the failure in *Recuenco* to include a specific reference to a "firearm" in the deadly weapon issue.[29] "Failure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error."[30] If the complete failure to submit a deadly weapon issue to the jury is not structural error, then it ineluctably follows that it is not structural error to submit a deadly weapon issue to the jury without an explicit instruction that the State must prove that issue beyond a reasonable doubt.[31]

■ The court of appeals also held that, even if the error were not structural, it was constitutionally harmful error under Tex.R.App. P. 44.2(a).[32] However, Rule 44.2(a) does not apply to jury-charge error. The appropriate standard for all errors in the jury-charge, statutory or constitutional, is that set out in *Almanza.*[33]

ror"); *see also Hooker v. State,* No. 12–02–00173–CR, 2003 WL 22048243, *2–3, *4, 2003 Tex.App. LEXIS 7668 *7–11 (Tex.App.-Tyler 2003, pet. ref'd) (applying *Almanza* analysis to unobjected-to jury-charge error in deadly weapon issue asking whether defendant "used or *exhibited* " a vehicle during commission of evading arrest offense and finding no "egregious harm").

27. It could have been easily corrected by adding the phrase "beyond a reasonable doubt" to both inquiries, such that they would read:

WE, THE JURY, find beyond a reasonable doubt that the defendant, RAYMOND OLIVAS, used a deadly weapon during the commission of the offense alleged in the indictment.

WE, THE JURY, do not find beyond a reasonable doubt that the defendant, RAYMOND OLIVAS, used a deadly weapon during the commission of the offense alleged in the indictment.

28. The instructions stated that "no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt"; "In case you have a rea-

sonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him"; "In determining the guilt or innocence of the defendant, you shall not discuss or consider the punishment, if any, which may be assessed against the defendant in the event he is found guilty beyond a reasonable doubt." Furthermore, the application paragraphs of the jury-charge repeated the correct beyond-a-reasonable-doubt burden of proof three times.

29. 126 S.Ct. at 2553.

30. *Id.*

31. It is, however, understandable that both appellant and the court of appeals might think otherwise because *Recuenco* did not definitively resolve this question until after the court of appeals had issued its opinion and appellant had filed his Brief in this Court.

32. *Olivas,* 153 S.W.3d at 118.

33. *Ex parte Smith,* 185 S.W.3d 455, 467 (Tex. Crim.App.2006); *Jimenez v. State,* 32 S.W.3d at 235, 238.

█ Finally, the court of appeals held that the omission of an explicit beyond-a-reasonable-doubt instruction in the deadly weapon special issue was "fundamental" and "egregious" error under *Almanza*.[34] Its *Almanza* analysis was, at best, succinct. It stated,

> An error results in egregious harm if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. The harm is determined by considering the entire charge; the state of the evidence, including contested issues and the weight of the probative evidence; the argument of counsel; and any other relevant information revealed by the record as a whole. Considering all of those factors, we are left with the conclusion that the court's judgment is based on a finding of the use of a deadly weapon that was not made by the jury "beyond a reasonable doubt." Thus, the error "affects the very basis of the case" and is "fundamental" and "egregious." [35]

We disagree. The court of appeals failed to analyze each *Almanza* factor, and its ultimate conclusion is not supported by the record.

First, one looks at the jury instructions as a whole.[36] Here, the State's beyond-a-reasonable-doubt burden of proof was repeated throughout the instructions.[37] There was no mention of any other possible burden of proof. There was no mention that appellant might have some burden of proof on any issue or fact. Although the deadly weapon issue itself did not set out any explicit burden of proof, neither did the "guilty" or "not guilty" verdict questions.[38] Thus, with both the "guilty" or "not guilty" verdict forms and the deadly weapon issue, the jury was required to refer back to the general instructions. And those instructions clearly told the jury that the State had the burden to prove, beyond a reasonable doubt, every element of the offense. On the other hand, as appellant argues, the term "deadly weapon" was never defined as an element of the offense, and the guilty verdict finding was separate from the deadly-weapon finding, indicating that the use of a deadly weap-

---

34. *Olivas*, 153 S.W.3d at 117.

35. *Id.* (citations omitted).

36. *See Boyde v. California*, 494 U.S. 370, 378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (repeating "the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge"); *see also Johnson v. Texas*, 509 U.S. 350, 368, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) ("In evaluating the instructions, [a court should] not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial' ").

37. Appellant argues that
> [t]he burden of proof was mentioned five (5) times in the charge. Four (4) of those times it related to the "elements," or the

"guilt" of the Respondent. Since a deadly weapon related to neither of those two issues, the charge was deficient in this regard. The only other mention of the burden of proof was one (1) statement that the burden of proof rests upon the state throughout the trial. However, this one statement was not specific to the special issue and was outweighed by the inferences created by the other four (4) references to the state's burden on the elements and guilt of the Respondent.
Appellant's Brief at 17.

38. The guilt-stage verdict questions were:

> WE, THE JURY, find the defendant, RAYMOND OLIVAS, **guilty** of the offense of Evading Arrest with a vehicle as charged in the indictment.
> WE, THE JURY, find the defendant, RAYMOND OLIVAS, **not guilty.**

on was not an element of the evading arrest offense itself. Thus, it is possible, when viewing the written jury instructions in isolation, that the jury might have thought that neither the State nor appellant had any burden of proof on this question. Therefore, the first factor is not determinative.

Second, one looks to the state of the evidence and the contested issues. The primary disputed issue at trial was appellant's identity as the driver of his mother's Pontiac Bonneville, but the question of whether that car was used as a deadly weapon during the four separate police chases was also contested. A conclusion that a car is a deadly weapon "requires evidence that others were endangered, and not merely a hypothetical potential for danger if others had been present." [39] Here, there is ample evidence that appellant's use of his mother's car posed an actual danger of death or serious bodily injury to others during three of those incidents:

1. *The November 27th incident (No. PD–1933–04):* Officer Agnew testified that, during this chase, which started at the Tobacco Barn gas station, appellant swerved into the oncoming lane of traffic as he sped around the corner from the gas station; he then "just took off as fast as he could down MLK," going 50 m.p.h. in a 30 m.p.h. zone; he overtook another vehicle, passing around it by driving in the oncoming traffic lane and making those drivers slow down to avoid a collision; [40] in Officer Agnew's opinion, the Pontiac was, during this time, capable of causing death or serious bodily injury to the other motorists on the road.

2. *The December 21st incident* (No. PD–1935–04): Officer Alvarez testified that he and two other officers, in three separate patrol cars, attempted to stop appellant who was fleeing from them at speeds approaching 100 m.p.h. southbound on Highway 6; the officers finally backed off because they didn't want him to hit another car at that speed; when they slowed down, appellant did also, then he made a U-turn across the median of the highway, causing two other cars to stop on the highway to avoid hitting him; as the officers turned to chase him back northbound on Highway 6, appellant once again drove across the grassy median, across the highway, over an embankment separating the highway from the frontage road, and then drove against the traffic until he got to University Drive where, after maneuver-

---

**39.** *[Edwin Harris] Mann v. State,* 13 S.W.3d 89, 92 (Tex.App.-Austin 2000), *aff'd,* 58 S.W.3d 132, (Tex.Crim.App.2001). In affirming the court of appeals's decision in *Mann,* we stated, "We have reviewed that part of the Court of Appeals' opinion dealing with the merits of appellant's deadly weapon claim and find it to be sound. We therefore adopt that part of the opinion as our own without further comment." 58 S.W.3d at 132. *See Drichas v. State,* 175 S.W.3d 795, 798 (Tex. Crim.App.2005) (finding legally sufficient evidence that car was used as a deadly weapon in prosecution for evading arrest because "[a]ppellant's manner of using ... his truck posed a danger to pursuing officers and other motorists that was more than simply hypothetical; the danger was real, and the manner in which appellant drove his truck made it capable of causing death or serious bodily injury, particularly where appellant drove on the wrong side of the highway").

**40.** Appellant argues that there is "only hypothetical evidence" suggesting that the driver of an oncoming vehicle who slowed down and pulled to the right to avoid appellant's car was in danger. There was, according to appellant, no actual danger because that driver avoided a collision. Avoidance of a collision does not, however, negate the existence of actual danger; instead, it shows a quick reaction in the face of actual danger.

ing around another car, he disappeared.

3. *The December 24th incident* (No. PD–1934–04): Officer Wiesepape testified that, after appellant jumped the curb in the Taste of China parking lot, drove down a grassy embankment, and jumped the curb in the opposite direction, he "blew" through the stop sign and forced the oncoming traffic to suddenly stop to avoid an accident. The traffic was still snarled up by the time Officer Wiesepape came to the stop sign in pursuit of appellant.

Appellant has not shown that the jury likely used some standard other than "beyond a reasonable doubt" to have made its deadly weapon findings. The evidence is sufficient to support such a finding beyond a reasonable doubt, however, it was not uncontested, and it was not so conclusive as to make the second factor determinative.

Third, one looks to the arguments of counsel. Both the State and defense told the jury that the State was required to prove, beyond a reasonable doubt, that appellant used his car as a deadly weapon. The defense argument was the more explicit concerning the State's general burden of proof:

"And what we're asking you do to is filter [the information] through that standard that we talked about when we talked about in voir dire, 'beyond a reasonable doubt.'

And remember how high a burden that was? Remember the levels that we went through where we talked about the *Terry* stop and the reasonable suspicion, and the probable cause, and getting up to preponderance of the evidence, and then clear and convincing evidence?

The standard that they would use to take away your children. And understanding that the standard that the State has to meet in this particular case is even higher than that. It is beyond a reasonable doubt.

. . .

So when you go through here and you start to filter all this information that has been presented to you, you have to use that as your guide: If the State has met their burden. That's what we have asked you to do. That's what a citizen has asked you to do; come in here as his peers."

The defense was also more explicit in telling the jury that it must find the deadly weapon issue beyond a reasonable doubt:

"[A]s the State told you, you've got to go through—if you find that evading arrest has occurred, and it is Raymond Olivas, then you've got to make a decision about a deadly weapon. And you've got to go through the same process. Beyond a reasonable doubt, that you believe in the manner of its use of intended use, is capable of causing death or serious bodily injury."

"And that 'beyond a reasonable doubt' is individual to each one of you."

This factor shows that the jury was explicitly informed that it could not answer the deadly-weapon issue affirmatively unless it found that the State had carried its burden of proof of "beyond a reasonable doubt." Although the express statement of law came from defense counsel, not the trial judge's instructions, nothing in the instructions contradicted it, and no one suggested that defense counsel's statement was incorrect or incomplete.

Fourth, one looks to any other relevant information. Here, the jury was obviously capable of discriminating between the various evading incidents and the deadly weapon findings because it found appellant guilty of evading arrest on December 12th,

but also found that he did not use a deadly weapon during that incident.[41]

In sum, it is hypothetically possible that the jury could have ignored defense counsel's cogent explanation of the State's burden of proof as being "beyond a reasonable doubt" both as to the elements of the offenses and as to the deadly weapon findings. There is, however, nothing in this record that suggests that the jury did ignore this plain statement of the law or that it failed to apply it correctly. Applying the individual *Almanza* factors to a review of this record, we conclude that appellant has failed to show "egregious harm,"—that type and level of harm which affects "the very basis of the case," deprived him of a "valuable right," or "vitally affect[ed] a defensive theory." [42]

We therefore reverse the judgment of the court of appeals and affirm the judgment of the trial court.

MEYERS, J., not participating.

---

**41.** Indeed, the State had explicitly told the jury, during its closing argument, "Now, when you decide these evading charges, you can find the defendant guilty of evading and not believe he used or exhibited a deadly weapon. You don't have to find both in order to find the defendant guilty." The jury did exactly that.

**42.** *Almanza,* 686 S.W.2d at 172.