**Affirmed and Memorandum Opinion filed October 9, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00415-CR

---

## HERBERT CLARENCE PHILLIPS, A/K/A HUBERT PHILLIPS, Appellant,

## V.

## THE STATE OF TEXAS, Appellee.

---

**On Appeal from the 178th District Court
Harris County
Trial Court Cause No. 1256685**

---

## M E M O R A N D U M   O P I N I O N

Appellant Herbert Clarence Phillips, a/k/a Hubert Phillips, appeals his conviction by a jury of possession with intent to deliver a controlled substance, namely dihydrocodeinone, weighing more than 200 grams and less than 400 grams by aggregate weight, including any adulterants or dilutants. After finding two enhancement paragraphs true, the court sentenced Phillips to 25 years' confinement in the Texas Department of Criminal Justice, Institutional Division. On appeal, Phillips raises four issues: (1) the indictment is fundamentally defective because it failed to identify a penalty group for the

dihydrocodeinone; (2) the trial court erred by denying Phillips's requested jury instruction on the defense of lawful possession with a valid prescription; (3) Phillips's consent to search his residence was given involuntarily; and (4) Phillips limited or revoked any consent with respect to a locked safe located inside his residence. We affirm.

I

In the early afternoon of March 25, 2010, Houston Police Department narcotics officers John Kowal and Jerry McClain conducted surveillance on Phillips's residence after receiving information that lead the officers to develop reasonable suspicion that Phillips was illegally selling prescription drugs from his residence. During the surveillance, officers viewed Phillips and his common-law wife, Elizabeth Camacho, return to the residence in a Pontiac vehicle. Shortly after that, the officers saw Phillips leave the apartment and drive away in the Pontiac. Kowal and McClain then informed other Houston police officers in the area, Officers Smith and Wagner, that Phillips had left his apartment in the Pontiac and instructed them to initiate a traffic stop if Phillips committed any traffic violations.

Smith soon observed Phillips making a right turn without using his right-turn signal indicator. At this point, Smith and Wagner stopped the vehicle. After entering Phillips's information into the police computer system, the officers learned that Phillips was driving with a suspended driver's license.

Smith asked Phillips to step out of the vehicle and also asked for his consent to search the vehicle. Phillips orally agreed. The officers placed Phillips, who was not handcuffed, in the rear of the patrol vehicle. Kowal and McClain arrived at the location within a few minutes and took over the investigation. Kowal testified that he approached Phillips, identified himself as a police officer, and explained the nature of the officers' narcotics investigation. Kowal gave Phillips his *Miranda* warnings[1] and asked for his cooperation. Phillips told Kowal that he would "be happy to cooperate" with the police

[1] *See Miranda v. Arizona,* 384 U.S. 436, 478–79 (1966).

and agreed to sign a written consent form to search his apartment. Kowal gave Phillips the consent form, asked him to read it, and watched as Phillips signed it.

Meanwhile, after Smith told McClain that Phillips had consented to the search of his vehicle, those two officers began the search and found in the Pontiac's center console three completed prescription forms written for three individuals who were not Phillips. Officers then brought appellant back to his apartment where they met Camacho at the front door and told her they had received Phillips's consent to search the apartment. Once inside, the officers saw "several pill[] bottles in the living room" and many more in Phillips's master bedroom, including "eight prescription vials . . . in eight different patient names" on the window sill, and fifteen empty hydrocodone prescription bottles elsewhere in the bedroom. Some of the bottles had Phillips's or Camacho's names on them.

While searching the master bedroom, officers located a small, "lockbox-type" safe. Camacho told the officers the safe belonged to Phillips and that she did not know the combination to open it. The officers brought Phillips into the bedroom and asked him about the safe, and he confirmed that it was his. After Phillips made several unsuccessful attempts to open the safe, he claimed that he had recently purchased the safe and was contemplating returning it to the store where he purchased it after experiencing problems with it. The officers told Phillips they could take the safe to a local fire department to have them open it. Phillips eventually entered the correct combination to allow the police to open and search the safe after he admitted the safe contained pills, marijuana, and a handgun.

Inside the safe, the police found: a purple velvet Crown Royal bag, which contained a loaded revolver; a couple of clear plastic baggies of marijuana; four one-hundred-dollar bills; and four prescription vials with prescription controlled substances in them. Two of the prescription bottles were labeled for "Vonda Busby" and "Helen Caesar," while the labels of the other two bottles had been scratched off. All of the pills in the bottles contained some amount of dihydrocodeinone combined with other non-

3

narcotic ingredients. In total, the officers seized 520 pills containing dihydrocodeinone weighing 369.9 grams, including adulterants and dilutants. They also discovered that Phillips had about $1,100 in his pocket, consisting of bills in small denominations, consistent with prescription-drug trafficking.

## II

In his first issue, Phillips contends that the indictment against him was fundamentally defective because it did not specify a penalty group for dihydrocodeinone and therefore it "failed to allege all of the statutory elements of a crime." Phillips maintains that this omission deprives the trial court of subject matter jurisdiction over the case, rendering his prosecution and the judgment of conviction void. The State responds that the indictment was not fundamentally defective and Phillips waived his objection to any alleged defect in the indictment by failing to make it before trial.

## A

The Texas Constitution requires that the State must obtain a grand-jury indictment in a felony case unless this requirement is waived by the defendant. TEX CONST. art. I, § 10. Absent an indictment or valid waiver, a district court does not have jurisdiction over the case. *Teal v. State*, 230 S.W. 3d 172, 174–75 (Tex. Crim. App. 2007); *Martin v. State*, 346 S.W.3d 229, 230–31 (Tex. App.—Houston [14th Dist.] 2011, no pet.). An indictment also provides a defendant with notice of the offense and allows the defendant to prepare a defense. *Teal*, 230 S.W.3d at 175; *Martin*, 346 S.W.3d at 231.

Article 1.14 of the Texas Code of Criminal Procedure provides that:

[i]f the defendant does not object to a defect, error, or irregularity of form or substance in an indictment or information before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the objection on appeal or in any other postconviction proceeding.

Tex. Code Crim. Proc. art. 1.14(b). Indictments charging a person with committing an offense, once presented, invoke the jurisdiction of the trial court, and jurisdiction is not contingent on whether the indictment contains defects of form or substance. *Teal*, 230

4

S.W.3d at 177. Thus, Texas law "requires the defendant to object to any error in the indictment before the day of trial and certainly before the jury is empaneled." *Id.*

Nevertheless, for the trial court to have jurisdiction, there still must be an "indictment." *Martin*, 346 S.W3d at 232. An indictment must allege that (1) a person (2) committed an offense. *Teal*, 230 S.W.3d at 179; *see also* Tex. Const. Art. V, § 12(b) (defining "indictment" as "a written instrument presented to a court by a grand jury charging a person with the commission of an offense"). Accordingly, a defendant may challenge for the first time on appeal an instrument that fails to charge the commission of an offense or does not charge a particular person with the crime. *See Teal*, 230 S.W.3d. at 178–80.

When determining whether an indictment is so flawed that it does not constitute an actual indictment and thus does not vest the trial court with jurisdiction, the critical determination is whether the court and the defendant can identify what penal-code provision is alleged and whether that provision vests the trial court with jurisdiction. *Kirkpatrick v. State*, 279 S.W.3d 324, 328 (Tex. Crim. App. 2009) (citing *Teal*, 230 S.W.3d at 180). We look to the indictment as a whole, not just to its specific formal requisites. *Id.* If we conclude that the trial court and the defendant can determine that the indictment intends to charge a felony or other offense for which the trial court has jurisdiction, then the instrument charges the commission of an offense, even if the instrument fails to allege an element of the offense or contains additional information indicating the person charged is innocent. *Teal*, 230 S.W.3d at 181–82; *Martin*, 346 S.W.3d 232.

B

The indictment presented in this case charged that Phillips "knowingly possess[ed] with intent to deliver a controlled substance, namely, DIHYDROCODEINONE, weighing more than 200 grams and less than 400 grams by aggregate weight, including any adulterants and dilutants." According to Phillips, the indictment failed to include an essential element of the offense because it did not explicitly identify which penalty group

of the Health and Safety Code applied to dihydrocodeinone. To support his position, Phillips primarily relies on *Benoit v. State*, 561 S.W.2d 810 (Tex. Crim. App. 1977), *abrogated on other grounds by Harrison v. State*, 187 S.W.3d 429 (Tex. Crim. App. 2005).

In *Benoit*, the defendant was charged with delivery of a controlled substance, namely codeine, but the indictment did not allege a penalty group that included codeine. *Benoit*, 561 S.W.2d at 812. At the time of the offense charged, codeine was listed in three different penalty groups based on the amount possessed, and the applicable statutory scheme provided for both felony and misdemeanor punishments. *Id*. at 814. The court held that "[t]he failure to allege in the indictment the amount involved or penalty group so as to reflect what punishment is involved, whether the offense is a misdemeanor or felony, or whether the District Court had jurisdiction renders the indictment fatally defective." *Id.* at 815.

In this case, however, dihydrocodeinone is listed in only one penalty group—Penalty Group 3, which includes:

> [A] material, compound, mixture, or preparation containing limited quantities of the following narcotic drugs, or any of their salts:
>
>> . . .
>>
>> not more than 300 milligrams of dihydrocodeinone (hydrocodone), or any of its salts, per 100 milliliters or not more than 15 milligrams per dosage unit, with a fourfold or greater quantity of an isoquinoline alkaloid of opium;
>>
>> not more than 300 milligrams of dihydrocodeinone (hydrocodone), or any of its salts, per 100 milliliters or not more than 15 milligrams per dosage unit, with one or more active, nonnarcotic ingredients in recognized therapeutic amounts . . . .

Tex. Health & Safety Code § 481.104(a)(4).[2] Thus, Penalty Group 3 is the only penalty

---

[2] We note that Penalty Group 1 consists of various opiates, opium derivatives, and "the following substances, however produced, except those narcotic drugs listed in another group," including "[h]ydrocodone not listed in Penalty Group 3." *See* Tex. Health & Safety Code § 481.102(3)(A). Although Penalty Group 3 lists dihydrocodeinone followed by the generic term "hydrocodone" in parentheses, the plain language of the statutes reflects that Penalty Group 3, the only penalty group in

6

group that could apply to the offense charged in the indictment against Phillips.

Further, unlike the indictment in *Benoit*, the indictment in this case alleged that Phillips possessed with intent to deliver dihydrocodeinone in a specific weight range— between 200 and 400 grams. The Health and Safety Code mandates that an offense involving the delivery of a substance in Penalty Group 3 in this weight range is a first-degree felony. *See* Tex. Health & Safety Code § 481.114(d). Moreover, possession with intent to deliver a controlled substance listed in Penalty Group 3 in any amount is at least a state jail felony. *See id.* § 481.114(b). Therefore, unlike in *Benoit*, the district court would have had jurisdiction over Phillips's case regardless of the quantity of dihydrocodeinone alleged. *See* Tex. Code Crim. Proc. Art. 4.05 ("District courts and criminal district courts shall have original jurisdiction in criminal cases of the grade of felony . . . .").

We conclude that the circumstances in this case are more analogous to *Bailey v. State* than with *Benoit*. *See Bailey v. State*, 543 S.W.2d 653 (Tex. Crim. App. 1976). In *Bailey*, the defendant was charged with possession of lysergic acid diethylamide (LSD), which at that time constituted a second-degree felony regardless of the amount of LSD possessed. *Id.* at 655. In response to the defendant's complaint that his indictment failed to list the penalty group that LSD fell under, the court of criminal appeals held that, because "[t]here [was] but one grade and one punishment for possessing [that] controlled substance," the district court had jurisdiction over the felony crime and "the failure of the indictment to specify the penalty group [was] not a defect in this case." *Id.*

Just as in *Bailey*, only one penalty group and one punishment range applies to the specific amount of dihydrocodeinone that Phillips was alleged to have possessed with the intent to deliver. Therefore, even though the indictment did not specifically identify Penalty Group 3, the allegations in the instrument were sufficient to enable Phillips to identify the offense alleged and the applicable punishment range, and to confer jurisdiction on the district court presiding over his case. *See Teal*, 230 S.W.3d at 181–82.

which dihydrocodeinone is specifically listed, is the only penalty group that applies to Phillips's case.

7

Because the indictment was constitutionally sufficient, any alleged defects in the indictment are not jurisdictional but are, instead, substance defects that must be raised before trial or be waived. *See* Tex. Code Crim. Proc. art. 1.14(b); *Teal*, 230 S.W.3d at 177–78. Phillips did not object to the alleged defect in the indictment before trial. Therefore, Phillips has waived his complaint that the indictment was defective. *See Teal*, 230 S.W.3d at 178.

We overrule Phillips's first issue.

## III

In his second issue, Phillips contends that the trial court abused its discretion when it denied his request for a jury instruction that it was a defense to prosecution that he possessed the dihydrocodeinone by a valid or lawful prescription. Phillips points to Kowal's testimony that some of the pill bottles found in the apartment reflected prescriptions dispensed in his name.

## A

An appellate court's first duty in analyzing a jury-charge issue is to decide whether error exists. *Ngo v. State,* 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error is found, the degree of harm necessary for reversal depends on whether the appellant preserved the error by objecting to the complained-of instruction. *Olivas v. State,* 202 S.W.3d 137, 144 (Tex. Crim. App. 2006); *see Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). If the defendant properly objected to the erroneous jury charge instruction, reversal is required if we find "some harm" to the defendant's rights. *Olivas,* 202 S.W.3d at 144 n.21; *Ngo,* 175 S.W.3d at 743; *Almanza,* 686 S.W.2d at 171. But if the defendant did not object, we may only reverse if the record shows egregious harm to the defendant. *Olivas*, 202 S.W.3d at 144; *Ngo*, 175 S.W.3d at 743–44; *Almanza*, 686 S.W.2d at 171.

The record reflects that Phillips timely requested the jury instruction. Therefore, we will reverse if the record shows Phillips suffered "some harm" as a result of the trial court's refusal to include his requested instruction.

B

During the charge conference, Phillips requested the proposed jury instruction in the following exchange:

> [Phillips's Counsel]: . . . I do have requests which I would like to read into the record. And the proposed request is under the law of possession, you are instructed that is — it is a defense to prosecution for possession of dihydrocodeinone, that one: The substance was obtained directly from or under — under a valid prescription or order of a practitioner acting in the course of professional practice.
>
> The Court: And what section is that?
>
> [Phillips's Counsel]: That would be — that would be a quote, or taken from Section 481.117(a) of the Health — Texas Health and Safety Code. It refers back to possession of drugs in Penalty Group III. And I believe that's what we're talking about, drugs in Penalty Group III. They talk about possession of dihydrocodeinone.

The defense that Phillips requested is contained in the statute governing "Possession of a Substance in Penalty Group 3." *See* Tex. Health & Safety Code § 481.117(a). Subsection (a) of this section provides:

> Except as authorized by this chapter, a person commits an offense if the person knowingly or intentionally possesses a controlled substance listed in Penalty Group 3, *unless the person obtains the substance directly from or under a valid prescription or order of a practitioner acting in the course of professional practice.*

*Id.* (emphasis added).

But Phillips was not prosecuted for possession under section 481.117; he was prosecuted for possession with intent to deliver under section 481.114. In contrast to section 481.117, section 481.114, titled "Manufacture or Delivery of Substance in Penalty Group 3 or 4," contains no language providing that possession under a valid

9

prescription is a defense or exception to this offense. *See* Tex. Health & Safety Code § 481.114(a) ("Except as authorized by this chapter, a person commits an offense if the person knowingly manufactures, delivers, or possesses with intent to deliver a controlled substance listed in Penalty Group 3 or 4."). Unlike section 481.117, section 481.114 provides no circumstances under which a person may possess with intent to deliver a controlled substance listed in Penalty Group 3, even if validly obtained. Therefore, even if we presume the jury heard evidence that Phillips had a valid prescription for dihydrocodeinone, such evidence would not raise a defense applicable to the offense of possession with intent to deliver.

Moreover, Phillips did not request an instruction on possession as a lesser-included offense. Instead, Phillips expressly declined to request that the jury be instructed on the lesser-included offense. During the charge conference, Phillips's counsel clarified that he was only asking for an instruction on the valid-prescription defense portion of the possession statute:

> [Phillips's Counsel]: This — this goes to really whether or not it's personal use. It's a personal use issue, I think. And — and if the jury believes that those 520 pills, you know, he's — he's a pill dealer and they're not — he's not taking those pills under a valid prescription, they're going to find him guilty. That's what the issue goes to.
>
> [Prosecutor]: If he's arguing for a lesser of just possession not the intent to deliver, that's a personal use. That's a separate issue, Your Honor.
>
> [Phillips's Counsel]: No, I'm not arguing for that.

Because Phillips did not request that the jury be instructed on the lesser offense of possession, the valid-prescription defense did not constitute the law applicable to the case, and the trial court was not obliged to *sua sponte* instruct the jury on it. *See Tolbert v. State*, 306 S.W.3d 776, 780–81 (Tex. Crim. App. 2010); *Delgado v. State*, 235 S.W.3d 244, 249–50 (Tex. Crim. App. 2007). Further, the trial court did not err by refusing to instruct the jury concerning a defense that was not applicable to the only offense submitted to the jury.

We therefore overrule Phillips's second issue.

IV

In his third and fourth issues, Phillips contends that he did not voluntarily consent to the search of his residence and that even if he voluntarily consented he either revoked or limited the scope of his consent to deny the police permission to open and search his locked safe in the master bedroom.

A

In reviewing the trial court's ruling on a motion to suppress evidence, we apply a bifurcated standard of review. *See, e.g., Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give almost total deference to the trial court's determinations of historical facts, and we review the application of the law of search and seizure de novo. *See id.* Because the trial court is able to observe the demeanor and appearance of a witness, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When the trial judge makes express findings of fact, we view the evidence in the light most favorable to his ruling and determine whether the evidence supports these factual findings. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).[3] Unless a trial court abuses its discretion in making a finding not supported by the record, we will defer to the trial court's fact findings and not disturb the findings on appeal. *Cantu v. State,* 817 S.W.2d 74, 77 (Tex. Crim. App. 1991).

Consent is one of the well-established exceptions to the constitutional requirements of both a warrant and probable cause to search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Carmouche*, 10 S.W.3d at 331. The State must show by clear and convincing evidence that the consent was freely given. *Carmouche*, 10 S.W.3d at 331. Whether consent was voluntary involves a question of fact that is determined from

---

[3] In this case, although the trial court did not make written findings of fact, it orally announced its findings on the record at the conclusion of the hearing on the motion to suppress. A court satisfies the requirement that it make written findings if it dictates its findings and conclusions to the court reporter, and they are transcribed and made a part of the statement of facts, filed with the district clerk, and made a part of the appellate record. *Alford v. State*, 358 S.W.3d 647, 651 n.6 (Tex. Crim. App. 2012).

the totality of the circumstances. *Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007). A person's consent to search can be communicated to law enforcement in a variety of ways, including by words, action, or circumstantial evidence showing implied consent. *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011). The trial judge must conduct a careful sifting and balancing of the unique facts and circumstances of each case in deciding whether a particular consent to search was voluntary or coerced. *Id.* at 459.

B

At trial, Officer Kowal testified that uniformed patrol officers stopped Phillips in his car after observing him fail to signal before making a right turn. Through his investigation, Kowal had also determined that Phillips's driver's license was suspended. When Kowal arrived at the scene of the traffic stop, he was in plain clothes and driving an unmarked car. Kowal introduced himself to Phillips, informed him of his *Miranda* rights, explained the nature of his investigation, and requested Phillips's cooperation. Officer McClain also testified that he arrived and heard Kowal giving Phillips his *Miranda* rights. According to Kowal, Phillips said, "Yes, yeah, I'll be happy to cooperate with you." Kowal testified Phillips was not handcuffed at the time, and Officers Smith and McClain also testified Phillips was not handcuffed. Although Kowal testified that Phillips was free to move about and talk, he also acknowledged Phillips was under arrest at the time and was not free to leave. Kowal gave Phillips the "consent to search" form after reminding him of his legal rights. Kowal also told Phillips he had the right to refuse to sign the form. Phillips insisted that he was "not a dope dealer," and agreed to sign the form authorizing the police to search his residence.

Phillips was placed in the back of a police car and was transported to his apartment about two blocks away. Kowal denied that Phillips was handcuffed while in the police car. Four officers eventually entered the apartment with Phillips. In the apartment, Kowal saw pill bottles in plain view and a small safe in the master bedroom. According to both Kowal and McClain, who were with Phillips in the bedroom, Phillips

12

acknowledged the safe was his. Kowal and McClain also testified that Phillips never indicated to them that he did not want them to search the safe. Phillips gave Kowal an incorrect combination to the safe, and after trying several times to enter the combination on the safe's digital keypad without success, Phillips told Kowal that the safe was broken and he was going to return it to the Walmart where he purchased it. Eventually, however, Phillips provided the correct combination, after admitting there were pills, marijuana, and a handgun in the safe. McClain acknowledged telling Phillips that if he did not provide them with the correct combination to the safe, they could have the fire department assist them in prying it open, but he denied that the officers threatened Phillips at any time.

Phillips testified he was handcuffed as soon as he got out of the car during the traffic stop, and denied that Kowal read him the *Miranda* warnings.[4] He also denied that he failed to signal his turn before he was stopped, that his license was suspended, and that he consented to the search of his car. After he was handcuffed, Phillips was placed in a patrol car while his car was searched. According to Phillips, he agreed to sign the consent form to search his apartment because the officers promised not to take him to jail for his traffic violations. Phillips did not read the consent form and no one read it to him or explained it to him. Phillips expected the officers to search his apartment, but he did not expect them to go into his safe. He testified that he told the officers three or four times that he did not want to open the safe, and he did not consent to opening the safe. Phillips stated that when he could not remember the combination to the safe, the officers threatened to take the safe to the fire department to have it opened. Phillips denied that the safe belonged to him, but he eventually provided the correct combination.

Phillips's common-law wife, Elizabeth Camacho, testified that she and Phillips had been together for seventeen years. According to Camacho, Phillips was in handcuffs when "about seven" officers brought him into the apartment. She remained in another

---

[4] The hearing on Phillips's motion to suppress occurred during trial after Phillips's counsel objected to the State's offer of the consent form Phillips signed. The trial court conducted the hearing outside the jury's presence, and orally pronounced its findings of fact and conclusions of law at the conclusion of the hearing. Phillips did not testify in front of the jury.

13

room with three of the officers while the other officers went into the master bedroom with Phillips. She could hear the officers attempting to open the safe, and she testified that although Phillips was worried and upset, he was cooperating with the officers. She also testified, however, that the officers "forced" Phillips to open the safe by threatening to take the safe to the fire station and break it open and warning that Phillips "would be in a lot of trouble." According to Camacho, the officers repeated the threat three or four times. She estimated the officers were in the master bedroom with Phillips for about half an hour before the safe was eventually opened.

1

At the conclusion of the suppression hearing, the trial court made several findings of fact and conclusions of law, including findings that the consent form was voluntarily executed, was valid on its face, and was "all-encompassing" in scope. Phillips challenges these findings, arguing that because the officers suspected Phillips was selling prescription drugs out of his apartment but lacked sufficient information to obtain a warrant, it is "virtually inconceivable" that the officers would have allowed him to leave the scene of his arrest without obtaining his consent to search his apartment. Phillips points to his testimony that he was handcuffed and admonished that he would not be released unless he signed the consent form, and his contradiction of the officers' testimony that he was read his *Miranda* rights. He claims his testimony was "eminently creditable" and the trial court wrongly concluded that Phillips was not credible. According to Phillips, "[t]he tactic of handcuffing and placing [Phillips] in the back of [the] police car was *intended* to overbear his free will."

But the testimony concerning whether Phillips was handcuffed when he consented to the search of his apartment was conflicting. The trial court, as the sole judge of the witnesses' credibility and the weight of their testimony, found that Phillips was not handcuffed when he was stopped for the traffic violation or when he was taken to his apartment, and he was "not cuffed summarily after being stopped as he indicated." The trial court also determined that Phillips was cooperative and consented to the officers'

14

search of his apartment. The record supports these findings. Kowal, McClain, and Smith all testified that Phillips was not handcuffed at any time during the traffic stop. Kowal testified that Phillips was cooperative and agreed to sign the consent form after he gave Phillips his legal warnings. Kowal also testified that Phillips was not handcuffed while he was escorted back to his apartment, and he was handcuffed only after the search of his apartment was completed and he was being taken to jail.

The testimony of the officers, combined with Phillips's signature on the consent form, which was admitted into evidence, provides clear and convincing evidence that the consent was freely and voluntarily given. Because the trial court was the sole judge of credibility, it was within the trial court's discretion to accept the officers' testimony and disbelieve Phillips' testimony concerning the circumstances under which his consent was given. *See Ross*, 32, S.W.3d at 855; *see also Cisneros v. State*, 290 S.W.3d 457, 465–66 (Tex. App.—Houston [14th Dist.] 2009, pet. dism'd) (holding trial court did not abuse its discretion by denying appellant's motion to suppress on grounds that consent was involuntary when testimony of officers and appellant was conflicting on consent issue). and therefore within the trial court's discretion to deny the motion to suppress. Therefore, viewing the totality of the circumstances in the light most favorable to the trial court's ruling, we conclude the trial court's ruling that Phillips voluntarily consented to the search of his apartment was not an abuse of discretion.

We therefore overrule Phillips's third issue.

2

In his fourth issue, Phillips contends that, even if he voluntarily consented to the search of his residence, he revoked or limited that consent when the officers asked for his cooperation to enter the locked safe in his apartment. Phillips points to his testimony that he initially refused to open the safe and ultimately provided the correct combination only after the officers threatened to take the safe to the fire department and have it forcibly opened. He also points out that he was never formally advised that he had the right to revoke his consent.

15

The trial court, in addition to disbelieving Phillips's account of the events and finding that his written consent to search was voluntary, found that the consent was "open-ended, all-encompassing," and covered the entirety of Phillips's residence. And, after finding that the officers entered with consent to search the apartment, he trial court also determined that:

> Whereupon the safe was entered into, after [Phillips] had previously given consent, and based on the credible evidence there is no indication [that Phillips] revoked his consent to search as — as a matter of fact, and as a conclusion of law.

Phillips argues that the trial court's resolution of this issue was not based on historical facts and it failed to apply the correct legal standard to the facts of record. He maintains that, as a matter of law, he withdrew or revoked his consent as to the locked safe.

The Court of Criminal Appeals has held that "the standard for measuring the scope of consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Valtierra*, 310 S.W.3d at 448–49 (internal quotation marks omitted) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). In *Valtierra*, the court acknowledged that "a person is free to limit the scope of the consent that he gives," but "[i]f the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way." *Id.* at 449 (internal quotation marks omitted) (quoting *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 670 (5th Cir. 2003)). Further, concerning the proper scope of a consensual search, the court stated:

> A consent search is a limited and conditional search only insofar as the consenting party has expressly stated, or, under the reasonable man standard in the light of all the existing circumstances, is deemed in fact to have impliedly attached, certain limitations under which the officers are authorized by him to search. The character of the search is determined by the scope of the authorization as understood by reasonable men having knowledge of all the existing factual circumstances, and not by any limitational rule of law applicable to all consent searches.

16

*Id.* at 449 n.30 (quoting *Johnson v. State*, 226 S.W.3d 439, 446 n.30 (Tex. Crim. App. 2007)).

Although Phillips testified that he did not expect the officers to search the safe, he conceded that "tried to open it" when the police asked him to. At the time, Phillips told the officers the safe was his, but at trial he denied owning the safe, stating that he did not know the combination "at first," and stated that he "got it from someone else." Phillips also claimed that he told the officers several times that he did not want them to open the safe, but that the officers "threatened . . . to take the safe to the fire department and they'd have it opened in two seconds" and he would be prosecuted for the safe's contents. Phillips then admitted, however, that he provided the incorrect combination accidentally—not in an effort to overtly deny the police access to the safe's contents or to impliedly revoke or limit his consent to search the safe.

Moreover, the officers testified that Phillips was cooperative with their investigation, and that Phillips admitted the safe contained "pills, marijuana, and a handgun" before it was opened. The officers also testified that Phillips never explicitly revoked or limited the scope of his consent to exclude the safe; rather, the only comments Phillips made about the safe were "that he had recently purchased [it] at a Walmart and that it was acting up" or was broken. Camacho also admitted that Phillips was cooperative with the officers' efforts to search the safe.

Viewing the totality of the circumstances in the light most favorable to the trial court's ruling, the evidence supports the trial court's conclusion that Phillips's consent to search his apartment was extensive in scope and, further, that Phillips did not expressly or impliedly limit or revoke his consent to exclude the safe. Phillips does not dispute that the police explained to him that they were investigating an allegation that prescription drugs were being sold from his apartment when they asked for his cooperation and consent to search the apartment. The consent form Phillips signed specifically permitted the police to "seize any and all letters, papers, materials, and other property that they desire." And, Phillips agreed to provide the combination to the safe and even attempted several times to

open it for the officers, impliedly demonstrating his consent to the search of the safe. Phillips's statements that the safe may have been malfunctioning, and his failed attempts to unlock the safe before he succeeded in opening it, did not amount to an express revocation or limitation of his consent.

On this record, then, it was objectively reasonable for the police to conclude that Phillips's consent to search included any containers within his residence that might contain drug-related evidence, including the locked safe. The Supreme Court has specifically held that if a person's "consent would be reasonably understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization" of consent from the person before the police may lawfully search that item. *Florida v. Jimeno*, 500 U.S. at 252; *see also United States v. Jones,* 356 F.3d 529, 534 (4th Cir.2004) (holding that defendant's express consent to search a duffle bag extended to a locked metal box inside the duffel bag); *United States v. Martinez,* 949 F .2d 1117, 1119 (11th Cir.1992) (holding that consent to search a warehouse unit for narcotics included the authority to open locked containers within). The trial court did not err by concluding that Phillips did not limit or revoke his consent to exclude the safe.

We therefore overrule Phillips's fourth issue.

\* \* \*

Accordingly, the judgment of the trial court is affirmed.

/s/     Jeffrey V. Brown
          Justice

Panel consists of Chief Justice Hedges and Justices Brown and Busby.

Do Not Publish — TEX. R. APP. P. 47.2(b).

18