COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-07-453-CR

 

 

MICHAEL RAY DILLON                                                         APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL
DISTRICT COURT NO. 3 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. Introduction

In two points, Appellant Michael Ray Dillon
appeals his conviction for aggravated assault with a deadly weapon.[2]  We affirm.

 

 








II. Factual and Procedural Background

The complainant, Rachel, met Dillon in 2003, when
she was sixteen years old and he was twenty-five or twenty-six.  In 2005, she discovered that she was
pregnant.  On February 10, 2005, she and
Dillon went to Kelli=s house.  Kelli, who Rachel testified was Dillon=s
friend, had arranged for Rachel to get a free sonogram; Kelli took Rachel to
the doctor=s office.  The doctor, who gave Rachel the sonogram as a
favor to Kelli, told Rachel that she was five to seven weeks=
pregnant.  Rachel testified that she told
Dillon she was five weeks= pregnant so that she would have
less opposition from him about having an abortion.[3]








Rachel and Kelli returned from the doctor=s office
around 8 p.m.  Upon their return to Kelli=s house,
Dillon counted back five weeks and compared them to the dates they had been
intimate; he told her that the dates did not match upCthey had
broken up briefly between December 26, 2004, and January 6, 2005, when the baby
had apparently been conceived.  Rachel
testified that Dillon closed the door, told her the baby was not his, grabbed
her by the neck, pushed her against the wall, and head-butted her.  Dillon admitted that he lost his temper and
did get Aphysical@ with
her, stating that he slapped her a couple of times and that Ait kind
of stopped her from cussing at [him] for a minute.@[4]  Photos of Rachel=s
injuries were admitted into evidence, and Dillon admitted that he assaulted
Rachel and caused those injuries, but he denied threatening her with a gun or
threatening her with injury, imminent bodily injury, or death.[5]









Kelli heard the fighting; Rachel and Dillon both
testified that Kelli called Rachel=s cell
phone, which Dillon used.  Rachel
testified that Dillon told Kelli that they were fine and hung up on her.  Dillon testified that he answered the phone
and said, AI=m sorry,
Kelli.  I don=t mean
to be yelling like this in your house,@ and
that she replied, AAll right.  Calm down@; he
then said, A[o]kay,@ and she
hung up.

Both Rachel and Dillon testified that he slapped
her and knocked her glasses off; the telephone transcription of Kelli=s
conversation with Arlington Police Detective Mandy Thomas in March 2005
contained Kelli=s description of the same
occurrence.  Rachel testified that Dillon
called her names and that she could not remember how many times he hit her
before he walked over to a little desk or table that was in the corner of the
room; when he walked back, he had a gun. 
Although she first testified that the gun was small, black, and had a
clip, she also testified that she could not remember whether it was black or
silver, and she later clarified that the gun Dillon used that night was black,
but that Dillon also had a silver gun.[6]  Rachel testified that Dillon started putting
bullets into the gun=s clip and told her he was going
to kill her.  She testified that Dillon
said that he would not go to jail for killing her because he would plead
insanity and that her family was going to have to pay him for every bullet he
put in her.  She gave the following
testimony:








Q.     And
let me ask you this, Rachel.  Did you
believe him?

 

A.     Yes.

 

Q.     Were
you afraid he was going to kill you?

 

A.     Yes.

 

Q.     Did
he ever put the clip inside the gun?

 

A.     Yes.

 

Q.     And
what happened?

 

A.     And
then he hit me with the gun a couple of times.

 

Q.     And
where did he hit you with the gun?

 

A.     In my
head.  And then I don=t remember where it
was.  He spit on me, and he was in my
face, and then he told me that if I didn=t want the baby, then he would get rid of
it.  And he had the gun to my head, and
he asked me how it felt to have my life in someone else=s hands.

 

Q.     And
he told you he=d get rid of the baby?

 

A.     That
if I didn=t want [it], then he=d get rid of it.

 

Q.     And
what did you think that meant?

 

A.     Probably
shoot me in the stomach.

 

. . .
. 

 

A.     . . .
[H]e called his dad and put him on speaker phone and told his dad that he was
about to kill me and to say goodbye.

 








She and Dillon both testified that Dillon spoke with several people on
the phone during the incident, either calling them or answering their
calls.  Dillon testified that he did not
have a gun that night and that he did not own a gun at the time of the assault.


Rachel and Dillon both testified that he told
Kelli to come into the room. Rachel testified that he hit her in front of
Kelli, received another phone call, and left with Kelli.  Dillon testified that he asked Kelli to drive
him.  Rachel testified that Kelli ran
back into the house and told her that Dillon was going to kill her and that she
needed to get out of there.  Kelli and
Dillon left in Rachel=s car.

After Dillon and Kelli left, Rachel called her
brother-in-law, Enrique, from Kelli=s house
and then from a nearby Wal-Mart.  Enrique
testified that he received the call after midnight, that when he found her at
the Wal-Mart, she had red marks on her face like someone had hit her, and that
she sobbed uncontrollably the whole way back to his house.  He did not recall whether he told the police
the first time he met with them that Rachel said Dillon had a gun.













Kelli, an exotic dancer, knew Dillon because they
had gone to school together since the sixth or seventh grade, and she had dated
or had been engaged to Dillon=s
brother, Shawn.[7]  The transcript of Kelli=s
conversation with Detective Thomas about the events of February 10 was read
into evidence.[8]  In the transcript, Kelli stated that Dillon
was holding a black gun, that she heard him say that he was going to shoot
Rachel, and that when she left with him, they went to Baby Dolls, a strip club.[9]  She estimated that they left her house around
10:30 p.m., spent twenty minutes at Baby Dolls, and got back to her house
around 11 or 11:30 p.m.; she said that after he left, she called the
police.  Detective Thomas testified that
911 calls made in the early morning of February 11 came from Kelli=s phone.[10]


Dillon testified that Kelli suggested going to
Baby Dolls and that he stayed in the car while she went inside.  When they arrived back at Kelli=s house,
Rachel was gone and he asked his friend Pete to follow him to his mother=s home
and then to take him to his father=s
home.  He testified his plan was to
unload his belongings from Rachel=s car
and to put her belongings into it. 

Pete, who was incarcerated at the time of trial
on two drug possession counts, testified that Dillon called him in the early
morning of February 10 or 11, asking him for a ride because he wanted to drop
off a car at some apartments and then to go to his father=s house.









Rachel testified that she reported the car stolen
and told the police where the vehicle might be found.  The police recovered Rachel=s car on
February 11 from the apartment complex where Dillon=s mother
lived.[11]  Rachel testified that when she picked up her
car at the police impound lot, she discovered three boxes of bullets, for .38
and .40 caliber guns, on the driver and passenger sides of the car and that the
Arlington police would not take them, so she kept them and brought them to
court.  She testified that the bullets
did not belong to her; they were admitted into evidence.  No gun was found in the vehicle.  Dillon testified that he did not recognize
the bullets that were found in Rachel=s car.

Dillon=s
stepmother and his father testified that Dillon called them on February 10,
that Pete dropped Dillon off, and that Dillon was crying when he arrived.  Dillon=s
stepmother testified that Dillon arrived that night between midnight and 2 a.m.
and that he had gone to his mother=s
apartment first.  Dillon=s
father, who was incarcerated for aggravated assault at the time of trial,
testified that Dillon came over to his house around 8:30 or 9 p.m.  Dillon testified that he arrived at his
father=s house
after midnight.  Dillon=s father
testified that Dillon did not threaten to kill anyone while he was on the phone
with him.

Dillon pleaded not guilty.  The jury found him guilty of aggravated
assault with a deadly weapon, and the trial court assessed punishment at eight
years=
confinement.








III. Discussion

In his first point, Dillon complains that the
trial court erred by instructing the jury on the lesser‑included offense
of Class A misdemeanor assault, claiming that because proof of Class A
misdemeanor assault requires proof of Abodily
injury,@ it is
not a lesser included offense of aggravated assault by threat.  In his second point, he argues that the trial
court erred by denying his requested jury instruction on the lesser‑included
offense of a Class C misdemeanor assault by threat.

A. Standard of Review

We use a two-step analysis to determine whether
an appellant was entitled to a lesser included offense instruction.  Hall v. State, 225 S.W.3d 524, 528 (Tex.
Crim. App. 2007); Rousseau v. State, 855 S.W.2d 666, 672B73 (Tex.
Crim. App.), cert. denied, 510 U.S. 919 (1993).  First, the lesser offense must come within
article 37.09 of the code of criminal procedure.  Tex. Code Crim. Proc. Ann. art. 37.09 (Vernon
2007); Moore v. State, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).








AAn offense is a lesser included
offense if . . . it is established by proof of the same or less than all the
facts required to establish the commission of the offense charged.@  Tex. Code Crim. Proc. Ann. art. 37.09(1); see
also Hall, 225 S.W.3d at 536.  This
inquiry is a question of law.  Hall,
225 S.W.3d at 535.  It does not depend on
the evidence to be produced at trial but is performed by comparing the elements
of the offense as they are alleged in the indictment or information with the
elements of the potential lesser included offense.  Id. at 525, 535B36.  

Second, some evidence must exist in the record
that would permit a jury to rationally find that if the appellant is guilty, he
is guilty only of the lesser offense.  Hall,
225 S.W.3d at 536; Salinas v. State, 163 S.W.3d 734, 741 (Tex. Crim.
App. 2005); Rousseau, 855 S.W.2d at 672B73.  The evidence must be evaluated in the context
of the entire record.  Moore, 969
S.W.2d at 8.  There must be some evidence
from which a rational jury could acquit the appellant of the greater offense
while convicting him of the lesser included offense.  Id. 
The court may not consider whether the evidence is credible,
controverted, or in conflict with other evidence.  Id. 
Anything more than a scintilla of evidence may be sufficient to entitle
a defendant to a lesser charge.  Hall,
225 S.W.3d at 536.

B. Class A and Class C Misdemeanor Assault Instructions








The elements of aggravated assault with a deadly
weapon as alleged in the indictment are that a person intentionally or
knowingly threatens another with imminent bodily injury and uses
or exhibits a deadly weapon during the commission of the assault.  See Tex. Penal Code Ann. '
22.02.  A Class A misdemeanor assault
involves intentionally, knowingly, or recklessly causing bodily injury to
another. See id. ' 22.01(a)(1), (b).  A Class C misdemeanor assault involves
intentionally or knowingly threatening another with imminent bodily
injury.  Id. ' 22.01(a)(2),
(c). 

Based on the language in the indictment, Dillon
was not entitled to a lesser included instruction on Class A misdemeanor
assault, and the trial court erred by including that instruction in the
charge.  See Tex. Code Crim. Proc.
Ann. art. 37.09(1); Hall, 225 S.W.3d at 535B36; see
also Irving v. State, 176 S.W.3d 842, 846 (Tex. Crim. App. 2005) (holding
that simple assault was not a lesser included offense of aggravated assault
when the same facts or less required to prove the greater offense charged in
the indictment were not required to prove the simple assault). 








However, Dillon was entitled to an instruction on
Class C misdemeanor assault.  See Hall,
225 S.W.3d at 535.  Rachel testified
that, in addition to physically striking her, Dillon had a gun and threatened
to kill her.  Although Kelli testified at
trial that she did not remember what happened that night, the transcript of her
conversation with Detective Thomas indicates that she saw Dillon physically
assault Rachel by pushing or shoving her face and knocking her glasses off, and
that Dillon had a black gun and said he was going to shoot Rachel.  Dillon admitted that he physically assaulted
Rachel, but he denied that he ever threatened her with a gun, denied having a
gun, and denied that he threatened her with injury, imminent bodily injury, or
death during the physical assault.  The
evidence would support the charged offense if the jury believed Rachel=s
testimony and the transcript of Kelli=s
conversation, and it would support a lesser included offense if the jury chose
to believe part of Dillon=s testimony.  See id. at 536; Moore, 969
S.W.2d at 8; see also Bell v. State, 693 S.W.2d 434, 443 (Tex. Crim.
App. 1985) (A[T]he jury, as the sole trier of
fact, was entitled to believe all or part of the conflicting testimony
proffered and introduced by either side.@).

C. Harm Analysis

Because the trial court erred by including the
Class A lesser included offense instruction and by failing to include the Class
C lesser included offense instruction, we must evaluate whether these errors
require reversal.  See Abdnor v. State,
871 S.W.2d 726, 731B32 (Tex. Crim. App. 1994).  

During the charge conference, defense counsel
(Mr. Shaw) and the trial court held the following conversation:

Mr. Shaw:  I
don=t think the State is
entitled to the lesser included charge of assault, and I would object to
that.  It=s not supported by the
evidence or raised in the indictment.

 

The Court:  So
you don=t want the Court to
submit the lesser included?

 








Mr. Shaw:  I
would like the Court to submit Class C.

 

The Court:  There=s not evidence that would
support Class C.  There=s evidence that supports
the Class A, and if you don=t want it, I=ll take it out, but I put it in there because I
expected you would want a lesser included offense.

 

Mr. Shaw:  I
do want a lesser included offense.  I
want a Class C.

 

The Court:  I
can only give you what I think the law allows you, Mr. Shaw, and I don=t believe the law allows
you a Class C.

 

Mr. Shaw:  Let
me put it in the record.  I=d like that AThe law provides that if
one intentionally or knowingly threatens another with imminent bodily injury,
he=s guilty of the offense
of assault.  Therefore, if you believe
beyond a reasonable doubt that Michael Dillon did intentionally or knowingly
threaten Rachel . . . with imminent bodily injury, you will find him guilty of
assault.@  That=s all.

 

The Court:  So
do you want me to take the A misdemeanor out?

 

Mr.
Shaw:  And put it in the proper one, yes.

The
Court:  If you want the Class A outC 

Mr. Shaw:  Certainly
the Court has the duty to charge under every application of the law, and you=reCapparently someone=s requested.  Maybe they haven=t.

 

The Court:  Nobody
said a word to me.  I just expected you
would request it, because I believe the law and evidence supports it.

 

Mr. Shaw:  I
don=t want it.

 








The Court:  Sir?

 

Mr. Shaw:  I
don=t want it.

 

The Court:  You
don=t want it?

 

Mr. Shaw:  I=ll take it.  I=ll take it. [Emphasis added.]

 

The Court:  Okay.  Then I had written down 20 minutes to a side
to argue.  Does anybody want more than
that?

 

Mr.
Shaw:  No, but by accepting this Class
A charge, I=m not abandoning my request for
the Class C. [Emphasis added.]








Error in the charge, if timely objected to in the
trial court as Dillon did to the Class C omission, requires reversal if the
error was Acalculated to injure the rights
of [the] defendant,@ which means no more than that
there must be some harm to the accused from the error.  Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon
2006); Abdnor, 871 S.W.2d at 731B32; Almanza
v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh=g); see
also Minor v. State, 91 S.W.3d 824, 827B29 (Tex.
App.CFort
Worth 2002, pet. ref=d) (applying analysis).  In other words, a properly preserved error
will require reversal as long as the error is not harmless.  Almanza, 686 S.W.2d at 171.  In making this determination, Athe
actual degree of harm must be assayed in light of the entire jury charge, the
state of the evidence, including the contested issues and weight of probative
evidence, the argument of counsel and any other relevant information revealed
by the record of the trial as a whole.@  Id.; see also Ovalle v. State,
13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

The court=s charge
instructed the jury on aggravated assault with a deadly weapon by threat and on
assault-bodily injury, and it stated, AIf you
have a reasonable doubt as to whether [Dillon] is guilty of aggravated assault
with a deadly weapon, you will acquit [Dillon] of aggravated assault with a
deadly weapon as charged in the Indictment and next consider whether he is
guilty of assault.@ 
The court=s charge instructed the jury
that if the prosecution failed to prove each and every element of the offenses
charged beyond a reasonable doubt, then it must acquit Dillon.








One of the contested issues at trial was whether
Dillon had a gun when he threatened Rachel; the other was whether Dillon
threatened her at all.  Both parties
agreed that Dillon physically assaulted her. 
Rachel testified, and Kelli=s
transcript corroborated, that Dillon threatened to kill Rachel and that he had
a gun, and the State submitted into evidence the three boxes of bullets that
Rachel claimed came from her vehicle upon its recovery from Dillon=s mother=s
apartment.  Dillon denied that he ever
threatened Rachel, with or without a gun, and claimed that he did not recognize
the bullets.  If the jury had found that
Dillon did not have a gun, then based on the incorrect jury charge, it had the
option of convicting Dillon of physically assaulting Rachel but not of
convicting him for threatening her. 

During closing arguments, the State argued that
Dillon had a gun based on Rachel=s
testimony and Kelli=s transcribed phone conversation
that corroborated it.  With regard to
Kelli=s
transcript, the State argued, 

It=s no
coincidence that [Kelli] knows that there was a black gun.  It is no coincidence that she knows that
[Rachel=s]
glasses were knocked off.  It is no
coincidence that that night [Kelli] went to Baby Dolls with him in the car,
that both of them are able to relate all of these details, because that=s
exactly the way it happened.

Then, the State attacked the credibility of the defense witnesses
because they did not witness the actual incident and could not accurately
remember when the police retrieved Rachel=s
vehicle or when Dillon arrived at his father=s house.









Dillon=s
counsel did not dispute that Dillon assaulted Rachel, stating, AI don=t think
there=s any
issue on that.  He assaulted her.  To the extent that he assaulted her it raises
the level of the offense called assault that you would probably want to find
him guilty of.  The issue is not whether
he assaulted her.@ 
Instead, Dillon=s counsel also focused on
witness credibility.  He argued that
Dillon told the truth and pointed out Dillon=s
testimony about his confusion when arrested fifteen months later because he
thought his brother or his father must be the one with the aggravated assault
charge.  He portrayed Kelli as a liar who
was settling an old score with Dillon, stating, AWell,
you knew that one time this victim of her boyfriend=s
assault [by sword] held the keys to whether or not he went to jail or was
prosecuted.@ 
And he portrayed Rachel as a manipulative, baby-killing liar.  He also brought up Enrique=s memory
lapse about when Rachel mentioned the gun and the absence of any gun in the
trial evidence.

In rebuttal, the State again argued that Rachel=s
testimony and Kelli=s transcript matched, and that
Kelli=s
transcript was reliable because she was Dillon=s
friend, not a cooperative witness for the State, and because she purported to
remember nothing during the trial.  The
State argued, AIf [Kelli] had [some] score to
settle here, if she wanted to do some pay-backs to the Defendant, she would
have been a whole lot more cooperative than she was,@ and it
argued that the case was about Dillon being upset because he thought Rachel was
pregnant with someone else=s babyCnot
about his concern for the baby itself. 
The State finished by again attacking the credibility of the defense
witnesses: Pete and Dillon=s
father, convicted felons who did not witness the actual incident, and
suggesting that Dillon had plenty of time to Aditch
the gun@ between
the time he left Kelli=s house and arrived at his
father=s house.








The jury submitted several notes to the trial
court during its deliberations. The first note requested a list of available
evidence and the second requested to see the evidence:  six photos of Rachel=s
injuries, the three boxes of bullets, and one compact disk of Kelli=s phone
call with Detective Thomas.  The jury
also requested the time that Kelli=s 911
calls were made[12]
and Rachel=s testimonyCspecifically,
Awhich
gun Rachel was confused on the color of,@ and Awhether
she was being asked about the gun used that night or a different gun.@[13]








In its sixth note, the jury asked, ADo we
all need to agree on the first point before we move on?@  The trial court responded, A[p]lease
refer to the Court=s charge and be governed
thereby.@  The jury subsequently requested, ADA
testimony when he was reading Kelli=s
statementCstarting when Det. Thomas ask[s]
if she saw a gun.@ 
The trial court provided the entire transcript of Detective Thomas=s phone
conversation with Kelli.  The jury also
requested Enrique=s testimony and Detective Thomas=s
testimony.  The trial court read portions
of Enrique=s testimony about Rachel calling
him twice and whether he remembered telling the police about the gun the first
time he talked with them, the portion of Kelli=s
transcript about the black gun, and the portions of Kelli=s
transcript involving the 911 calls.  The
trial court had to instruct the jury several times that it could only give them
portions of testimony for which there was a dispute about a specific point.








Based on all of the above, we conclude that the
trial court=s error in failing to include
the requested Class C lesser included offense instruction caused no harm.  The contested issues, based on the evidence
and the arguments of counsel, revolved around witness credibility.  Because the jury determines the weight to be
given contradictory testimonial evidence, i.e., whether Dillon had a gun and
whether he threatened Rachel with it, we cannot say that the failure to include
a lesser included offense instruction on threats alone harmed Dillon under the
circumstances presented here.  See
Johnson v. State, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000) (requiring
deference to the jury=s determination of the weight to
be given contradictory testimonial evidence). 
Further, Dillon admitted during testimony and defense counsel conceded
during closing arguments that Dillon was guilty of assault as submitted in the
Class A lesser included offense instruction. 
Therefore, if the jury had failed to find that Dillon threatened Rachel
with a gun, however incorrectly the Class A instruction might have been
included, they had no reason not to find him guilty of it.  Based on the jury notes, the jury clearly deliberated
upon the gun issue and ultimately concluded that Rachel=s
testimony was more credible than Dillon=s on
that point.  Therefore, we overrule
Dillon=s second
point.  And because there was no
egregious harm from the trial court=s error
by including the Class A charge, we overrule this point as well.[14]








IV. Conclusion

Having overruled both of Dillon=s
points, we affirm the trial court=s
judgment.

PER CURIAM

PANEL: MCCOY, J.; CAYCE, C.J.; and DAUPHINOT, J.

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: February 26,
2009

 











[1]See Tex. R. App. P. 47.4.





[2]See Tex. Penal Code Ann. ' 22.02 (Vernon Supp.
2008).





[3]Dillon=s counsel asked Rachel
whether it was Aall manipulation to get
[Dillon] to agree to abort the child?@  Rachel
responded, ANo.  I made it easier for him and for me, because
I knew he would get madder and it would be worse if I told him it was his and I
wasn=t going to keep it.@  Defense counsel then asked her the following:


 

Q.
    So you made him think it wasn=t his?

 

A.
    Yes.

 

Q.
    Do you have trouble lying?

 

A.     No.

 

 





[4]Dillon testified that
Rachel told him, AI don=t want to have this
fucking kid,@ and that this upset
him.  He testified that he wanted the
baby.





[5]Dillon testified that, at
first, he did not know why he was arrested for aggravated assault with a deadly
weapon and that he asked the police to make sure that they did not want his
brother or his father instead.





[6]Rachel testified that
Dillon had a gun sometimes, but that she did not see it on him everyday.  She stated that he had had a silver,
semi-automatic gun that might have been .38 caliber, but she did not know if he
owned that gun.  Dillon testified that he
had owned a .38 revolver and that he had sold it to his mother=s friend for $250 when he
found out Rachel was pregnant.





[7]Shawn had apparently
assaulted Dillon at some point in the past by cutting Dillon=s shoulder with a
sword.  Kelli knew Dillon=s counsel because she had
hired him to represent Shawn when he was charged with that assault.  In the transcript of Kelli=s conversation with the
police, she stated, A[Dillon=s] actually my ex-fiance=s brother. . . . He=s just like his
brother.  He=s like very, very
abusive.  He=s acting just like him,
like his whole family.  They=re, like, domestic
violence.@





[8]The transcript
corroborated Rachel=s testimony:

 

[Dillon] brought her over
to get a sonogram, and I don=t know. 
Like he got mad.  He got mad at
her, and I was in my room, and I heard like yelling and stuff, and I didn=t know what was going
on.  And I went in there, and he was just
acting crazy-like. . . . Like yelling at her, and like, I don=t know, he like pushed
her.  I just remember like banging and
stuff whenever I was in my room.  I was
like, oh, my God, I don=t know what=s going on. . . . He was
like saying like I=m going to kill, like I
would kill you or something. . . . He=s like, the baby, I know the baby is not [m]ine.

 





[9]In the telephone
transcript, Kelli stated that they went to Baby Dolls because Dillon Ahad to talk to some girl
he was talking to, I guess to calm him down or something.@





[10]Kelli set up an
appointment with the police during the phone conversation, but she did not go,
and she stated at trial that she might have been a little intoxicated when the
transcript was made.  At trial, she
testified that she did not remember the events of February 10 and that she did
not remember seeing a gun.





[11]Dillon=s mother testified that
the police seized Rachel=s car at her apartment
complex on February 14.  She testified
that when she and her friend pulled into the apartment parking lot, there were
two police officers waiting at the main office, and then four more police officers
arrived and pulled them over. She testified that they spent about an hour and a
half in the parking lot and that the police asked her if she knew where Dillon
was.





[12]The jury requested this
information several times.  The
information provided in response to the jury=s requests was from Kelli=s cross-examination, in
which she stated she did not remember when she made the 911 calls, and
Detective Thomas=s cross-examination, in
which she testified that the 911 calls were made in the early morning hours of
February 11 and showed that they came from Kelli=s phone number.





[13]The trial court had the
following portion of testimony read to the jury:

 

Question: Didn=t you describe it as a
silver possibly .380 automatic?

 

Answer:  Uh-huh.

 

Question:  When I asked you about the silver gun, you
said you didn=t remember and now you
remember? 

 

Answer:  No.  I
said it was a silver gun he had.

 

Question: When?

 

Answer: He had it all the
time.

 

Question: Except the
night that he had a black gun?

 

Answer: Yes.

 





[14]Because Dillon waived his
objection to the Class A charge, this error is reviewed under the egregious
harm standard.  See Almanza,
686 S.W.2d at 171; see also Tex. Code Crim. Proc. Ann. art. 36.19; Allen
v. State, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); Hutch v. State,
922 S.W.2d 166, 171 (Tex. Crim. App. 1996). 
Although the same factors are evaluated as in the previous analysis,
egregious harm is the type and level of harm that affects the very basis of the
case, deprives the defendant of a valuable right, or vitally affects a
defensive theory and the purpose of the review is to illuminate the actual, not
just theoretical, harm to the accused.  See
Almanza, 686 S.W.2d at 171B72; see also Allen, 253 S.W.3d at 264
& n.15; Olivas v. State, 202 S.W.3d 137, 144, 149 (Tex. Crim. App.
2006).  Had the jury convicted Dillon of
Class A misdemeanor assault, Dillon would have suffered egregious harm because
that charge should not have been included as a lesser included offense.  Because the jury convicted Dillon of
aggravated assault with a deadly weapon as set out in the indictment, Dillon
suffered no harm from the erroneous inclusion of the Class A instruction.