

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-07-453-CR

MICHAEL RAY DILLON                                    APPELLANT

V.

THE STATE OF TEXAS                                         STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In two points, Appellant Michael Ray Dillon appeals his conviction for aggravated assault with a deadly weapon.[2]  We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

[2] *See* Tex. Penal Code Ann. § 22.02 (Vernon Supp. 2008).

## II. Factual and Procedural Background

The complainant, Rachel, met Dillon in 2003, when she was sixteen years old and he was twenty-five or twenty-six. In 2005, she discovered that she was pregnant. On February 10, 2005, she and Dillon went to Kelli's house. Kelli, who Rachel testified was Dillon's friend, had arranged for Rachel to get a free sonogram; Kelli took Rachel to the doctor's office. The doctor, who gave Rachel the sonogram as a favor to Kelli, told Rachel that she was five to seven weeks' pregnant. Rachel testified that she told Dillon she was five weeks' pregnant so that she would have less opposition from him about having an abortion.[3]

---

[3] Dillon's counsel asked Rachel whether it was "all manipulation to get [Dillon] to agree to abort the child?" Rachel responded, "No. I made it easier for him and for me, because I knew he would get madder and it would be worse if I told him it was his and I wasn't going to keep it." Defense counsel then asked her the following:

Q.    So you made him think it wasn't his?

A.    Yes.

Q.    Do you have trouble lying?

A.    No.

Rachel and Kelli returned from the doctor's office around 8 p.m. Upon their return to Kelli's house, Dillon counted back five weeks and compared them to the dates they had been intimate; he told her that the dates did not match up—they had broken up briefly between December 26, 2004, and January 6, 2005, when the baby had apparently been conceived. Rachel testified that Dillon closed the door, told her the baby was not his, grabbed her by the neck, pushed her against the wall, and head-butted her. Dillon admitted that he lost his temper and did get "physical" with her, stating that he slapped her a couple of times and that "it kind of stopped her from cussing at [him] for a minute."[4] Photos of Rachel's injuries were admitted into evidence, and Dillon admitted that he assaulted Rachel and caused those injuries, but he denied threatening her with a gun or threatening her with injury, imminent bodily injury, or death.[5]

Kelli heard the fighting; Rachel and Dillon both testified that Kelli called Rachel's cell phone, which Dillon used. Rachel testified that Dillon told Kelli that they were fine and hung up on her. Dillon testified that he answered the phone and said, "I'm sorry, Kelli. I don't mean to be yelling like this in your

[4] Dillon testified that Rachel told him, "I don't want to have this fucking kid," and that this upset him. He testified that he wanted the baby.

[5] Dillon testified that, at first, he did not know why he was arrested for aggravated assault with a deadly weapon and that he asked the police to make sure that they did not want his brother or his father instead.

house," and that she replied, "All right. Calm down"; he then said, "[o]kay," and she hung up.

Both Rachel and Dillon testified that he slapped her and knocked her glasses off; the telephone transcription of Kelli's conversation with Arlington Police Detective Mandy Thomas in March 2005 contained Kelli's description of the same occurrence. Rachel testified that Dillon called her names and that she could not remember how many times he hit her before he walked over to a little desk or table that was in the corner of the room; when he walked back, he had a gun. Although she first testified that the gun was small, black, and had a clip, she also testified that she could not remember whether it was black or silver, and she later clarified that the gun Dillon used that night was black, but that Dillon also had a silver gun.[6] Rachel testified that Dillon started putting bullets into the gun's clip and told her he was going to kill her. She testified that Dillon said that he would not go to jail for killing her because he would plead insanity and that her family was going to have to pay him for every bullet he put in her. She gave the following testimony:

---

[6] Rachel testified that Dillon had a gun sometimes, but that she did not see it on him everyday. She stated that he had had a silver, semi-automatic gun that might have been .38 caliber, but she did not know if he owned that gun. Dillon testified that he had owned a .38 revolver and that he had sold it to his mother's friend for $250 when he found out Rachel was pregnant.

4

Q. And let me ask you this, Rachel. Did you believe him?

A. Yes.

Q. Were you afraid he was going to kill you?

A. Yes.

Q. Did he ever put the clip inside the gun?

A. Yes.

Q. And what happened?

A. And then he hit me with the gun a couple of times.

Q. And where did he hit you with the gun?

A. In my head. And then I don't remember where it was. He spit on me, and he was in my face, and then he told me that if I didn't want the baby, then he would get rid of it. And he had the gun to my head, and he asked me how it felt to have my life in someone else's hands.

Q. And he told you he'd get rid of the baby?

A. That if I didn't want [it], then he'd get rid of it.

Q. And what did you think that meant?

A. Probably shoot me in the stomach.

. . . .

A. . . . [H]e called his dad and put him on speaker phone and told his dad that he was about to kill me and to say goodbye.

5

She and Dillon both testified that Dillon spoke with several people on the phone during the incident, either calling them or answering their calls. Dillon testified that he did not have a gun that night and that he did not own a gun at the time of the assault.

Rachel and Dillon both testified that he told Kelli to come into the room. Rachel testified that he hit her in front of Kelli, received another phone call, and left with Kelli. Dillon testified that he asked Kelli to drive him. Rachel testified that Kelli ran back into the house and told her that Dillon was going to kill her and that she needed to get out of there. Kelli and Dillon left in Rachel's car.

After Dillon and Kelli left, Rachel called her brother-in-law, Enrique, from Kelli's house and then from a nearby Wal-Mart. Enrique testified that he received the call after midnight, that when he found her at the Wal-Mart, she had red marks on her face like someone had hit her, and that she sobbed uncontrollably the whole way back to his house. He did not recall whether he told the police the first time he met with them that Rachel said Dillon had a gun.

Kelli, an exotic dancer, knew Dillon because they had gone to school together since the sixth or seventh grade, and she had dated or had been

6

engaged to Dillon's brother, Shawn.[7] The transcript of Kelli's conversation with

Detective Thomas about the events of February 10 was read into evidence.[8]

In the transcript, Kelli stated that Dillon was holding a black gun, that she heard

him say that he was going to shoot Rachel, and that when she left with him,

they went to Baby Dolls, a strip club.[9] She estimated that they left her house

around 10:30 p.m., spent twenty minutes at Baby Dolls, and got back to her

house around 11 or 11:30 p.m.; she said that after he left, she called the

---

[7]▲ Shawn had apparently assaulted Dillon at some point in the past by cutting Dillon's shoulder with a sword. Kelli knew Dillon's counsel because she had hired him to represent Shawn when he was charged with that assault. In the transcript of Kelli's conversation with the police, she stated, "[Dillon's] actually my ex-fiance's brother. . . . He's just like his brother. He's like very, very abusive. He's acting just like him, like his whole family. They're, like, domestic violence."

[8]▲ The transcript corroborated Rachel's testimony:

[Dillon] brought her over to get a sonogram, and I don't know. Like he got mad. He got mad at her, and I was in my room, and I heard like yelling and stuff, and I didn't know what was going on. And I went in there, and he was just acting crazy-like. . . . Like yelling at her, and like, I don't know, he like pushed her. I just remember like banging and stuff whenever I was in my room. I was like, oh, my God, I don't know what's going on. . . . He was like saying like I'm going to kill, like I would kill you or something. . . . He's like, the baby, I know the baby is not [m]ine.

[9]▲ In the telephone transcript, Kelli stated that they went to Baby Dolls because Dillon "had to talk to some girl he was talking to, I guess to calm him down or something."

police. Detective Thomas testified that 911 calls made in the early morning of February 11 came from Kelli's phone.[10]

Dillon testified that Kelli suggested going to Baby Dolls and that he stayed in the car while she went inside. When they arrived back at Kelli's house, Rachel was gone and he asked his friend Pete to follow him to his mother's home and then to take him to his father's home. He testified his plan was to unload his belongings from Rachel's car and to put her belongings into it.

Pete, who was incarcerated at the time of trial on two drug possession counts, testified that Dillon called him in the early morning of February 10 or 11, asking him for a ride because he wanted to drop off a car at some apartments and then to go to his father's house.

Rachel testified that she reported the car stolen and told the police where the vehicle might be found. The police recovered Rachel's car on February 11 from the apartment complex where Dillon's mother lived.[11] Rachel testified that

---

[10] Kelli set up an appointment with the police during the phone conversation, but she did not go, and she stated at trial that she might have been a little intoxicated when the transcript was made. At trial, she testified that she did not remember the events of February 10 and that she did not remember seeing a gun.

[11] Dillon's mother testified that the police seized Rachel's car at her apartment complex on February 14. She testified that when she and her friend pulled into the apartment parking lot, there were two police officers waiting at the main office, and then four more police officers arrived and pulled them over. She testified that they spent about an hour and a half in the parking lot and that

8

when she picked up her car at the police impound lot, she discovered three boxes of bullets, for .38 and .40 caliber guns, on the driver and passenger sides of the car and that the Arlington police would not take them, so she kept them and brought them to court. She testified that the bullets did not belong to her; they were admitted into evidence. No gun was found in the vehicle. Dillon testified that he did not recognize the bullets that were found in Rachel's car.

Dillon's stepmother and his father testified that Dillon called them on February 10, that Pete dropped Dillon off, and that Dillon was crying when he arrived. Dillon's stepmother testified that Dillon arrived that night between midnight and 2 a.m. and that he had gone to his mother's apartment first. Dillon's father, who was incarcerated for aggravated assault at the time of trial, testified that Dillon came over to his house around 8:30 or 9 p.m. Dillon testified that he arrived at his father's house after midnight. Dillon's father testified that Dillon did not threaten to kill anyone while he was on the phone with him.

Dillon pleaded not guilty. The jury found him guilty of aggravated assault with a deadly weapon, and the trial court assessed punishment at eight years' confinement.

---

the police asked her if she knew where Dillon was.

9

## III. Discussion

In his first point, Dillon complains that the trial court erred by instructing the jury on the lesser-included offense of Class A misdemeanor assault, claiming that because proof of Class A misdemeanor assault requires proof of "bodily injury," it is not a lesser included offense of aggravated assault by threat. In his second point, he argues that the trial court erred by denying his requested jury instruction on the lesser-included offense of a Class C misdemeanor assault by threat.

## A. Standard of Review

We use a two-step analysis to determine whether an appellant was entitled to a lesser included offense instruction. *Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007); *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App.), *cert. denied*, 510 U.S. 919 (1993). First, the lesser offense must come within article 37.09 of the code of criminal procedure. Tex. Code Crim. Proc. Ann. art. 37.09 (Vernon 2007); *Moore v. State,* 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).

"An offense is a lesser included offense if . . . it is established by proof of the same or less than all the facts required to establish the commission of the offense charged." Tex. Code Crim. Proc. Ann. art. 37.09(1); *see also Hall*, 225 S.W.3d at 536. This inquiry is a question of law. *Hall*, 225 S.W.3d at

535. It does not depend on the evidence to be produced at trial but is performed by comparing the elements of the offense as they are alleged in the indictment or information with the elements of the potential lesser included offense. *Id.* at 525, 535–36.

Second, some evidence must exist in the record that would permit a jury to rationally find that if the appellant is guilty, he is guilty only of the lesser offense. *Hall*, 225 S.W.3d at 536; *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); *Rousseau*, 855 S.W.2d at 672–73. The evidence must be evaluated in the context of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the appellant of the greater offense while convicting him of the lesser included offense. *Id.* The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Id.* Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge. *Hall*, 225 S.W.3d at 536.

**B. Class A and Class C Misdemeanor Assault Instructions**

The elements of aggravated assault with a deadly weapon as alleged in the indictment are that a person intentionally or knowingly *threatens* another with imminent bodily injury *and* uses or exhibits a deadly weapon during the commission of the assault. *See* Tex. Penal Code Ann. § 22.02. A Class A

11

misdemeanor assault involves intentionally, knowingly, or recklessly *causing bodily injury* to another. *See id.* § 22.01(a)(1), (b). A Class C misdemeanor assault involves intentionally or knowingly threatening another with imminent bodily injury. *Id.* § 22.01(a)(2), (c).

Based on the language in the indictment, Dillon was not entitled to a lesser included instruction on Class A misdemeanor assault, and the trial court erred by including that instruction in the charge. *See* Tex. Code Crim. Proc. Ann. art. 37.09(1); *Hall*, 225 S.W.3d at 535–36; *see also Irving v. State*, 176 S.W.3d 842, 846 (Tex. Crim. App. 2005) (holding that simple assault was not a lesser included offense of aggravated assault when the same facts or less required to prove the greater offense charged in the indictment were not required to prove the simple assault).

However, Dillon was entitled to an instruction on Class C misdemeanor assault. *See Hall*, 225 S.W.3d at 535. Rachel testified that, in addition to physically striking her, Dillon had a gun and threatened to kill her. Although Kelli testified at trial that she did not remember what happened that night, the transcript of her conversation with Detective Thomas indicates that she saw Dillon physically assault Rachel by pushing or shoving her face and knocking her glasses off, and that Dillon had a black gun and said he was going to shoot Rachel. Dillon admitted that he physically assaulted Rachel, but he denied that

12

he ever threatened her with a gun, denied having a gun, and denied that he threatened her with injury, imminent bodily injury, or death during the physical assault. The evidence would support the charged offense if the jury believed Rachel's testimony and the transcript of Kelli's conversation, and it would support a lesser included offense if the jury chose to believe part of Dillon's testimony. *See id.* at 536; *Moore*, 969 S.W.2d at 8; *see also Bell v. State*, 693 S.W.2d 434, 443 (Tex. Crim. App. 1985) ("[T]he jury, as the sole trier of fact, was entitled to believe all or part of the conflicting testimony proffered and introduced by either side.").

**C. Harm Analysis**

Because the trial court erred by including the Class A lesser included offense instruction and by failing to include the Class C lesser included offense instruction, we must evaluate whether these errors require reversal. *See Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994).

During the charge conference, defense counsel (Mr. Shaw) and the trial court held the following conversation:

> Mr. Shaw: I don't think the State is entitled to the lesser included charge of assault, and I would object to that. It's not supported by the evidence or raised in the indictment.
>
> The Court: So you don't want the Court to submit the lesser included?

13

Mr. Shaw: I would like the Court to submit Class C.

The Court: There's not evidence that would support Class C. There's evidence that supports the Class A, and if you don't want it, I'll take it out, but I put it in there because I expected you would want a lesser included offense.

Mr. Shaw: I do want a lesser included offense. I want a Class C.

The Court: I can only give you what I think the law allows you, Mr. Shaw, and I don't believe the law allows you a Class C.

Mr. Shaw: Let me put it in the record. I'd like that "The law provides that if one intentionally or knowingly threatens another with imminent bodily injury, he's guilty of the offense of assault. Therefore, if you believe beyond a reasonable doubt that Michael Dillon did intentionally or knowingly threaten Rachel . . . with imminent bodily injury, you will find him guilty of assault." That's all.

The Court: So do you want me to take the A misdemeanor out?

Mr. Shaw: And put it in the proper one, yes.

The Court: If you want the Class A out—

Mr. Shaw: Certainly the Court has the duty to charge under every application of the law, and you're—apparently someone's requested. Maybe they haven't.

The Court: Nobody said a word to me. I just expected you would request it, because I believe the law and evidence supports it.

Mr. Shaw: I don't want it.

14

The Court:  Sir?

Mr. Shaw:  I don't want it.

The Court:  You don't want it?

Mr. Shaw:  *I'll take it.  I'll take it.* [Emphasis added.]

The Court:  Okay.  Then I had written down 20 minutes to a side to argue.  Does anybody want more than that?

Mr. Shaw:  *No, but by accepting this Class A charge, I'm not abandoning my request for the Class C.* [Emphasis added.]

Error in the charge, if timely objected to in the trial court as Dillon did to the Class C omission, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error.  Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 2006); *Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Minor v. State*, 91 S.W.3d 824, 827–29 (Tex. App.—Fort Worth 2002, pet. ref'd) (applying analysis).  In other words, a properly preserved error will require reversal as long as the error is not harmless.  *Almanza*, 686 S.W.2d at 171.  In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other

15

relevant information revealed by the record of the trial as a whole." *Id.*; *see also Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

The court's charge instructed the jury on aggravated assault with a deadly weapon by threat and on assault-bodily injury, and it stated, "If you have a reasonable doubt as to whether [Dillon] is guilty of aggravated assault with a deadly weapon, you will acquit [Dillon] of aggravated assault with a deadly weapon as charged in the Indictment and next consider whether he is guilty of assault." The court's charge instructed the jury that if the prosecution failed to prove each and every element of the offenses charged beyond a reasonable doubt, then it must acquit Dillon.

One of the contested issues at trial was whether Dillon had a gun when he threatened Rachel; the other was whether Dillon threatened her at all. Both parties agreed that Dillon physically assaulted her. Rachel testified, and Kelli's transcript corroborated, that Dillon threatened to kill Rachel and that he had a gun, and the State submitted into evidence the three boxes of bullets that Rachel claimed came from her vehicle upon its recovery from Dillon's mother's apartment. Dillon denied that he ever threatened Rachel, with or without a gun, and claimed that he did not recognize the bullets. If the jury had found that Dillon did not have a gun, then based on the incorrect jury charge, it had the

16

option of convicting Dillon of physically assaulting Rachel but not of convicting him for threatening her.

During closing arguments, the State argued that Dillon had a gun based on Rachel's testimony and Kelli's transcribed phone conversation that corroborated it. With regard to Kelli's transcript, the State argued,

> It's no coincidence that [Kelli] knows that there was a black gun. It is no coincidence that she knows that [Rachel's] glasses were knocked off. It is no coincidence that that night [Kelli] went to Baby Dolls with him in the car, that both of them are able to relate all of these details, because that's exactly the way it happened.

Then, the State attacked the credibility of the defense witnesses because they did not witness the actual incident and could not accurately remember when the police retrieved Rachel's vehicle or when Dillon arrived at his father's house.

Dillon's counsel did not dispute that Dillon assaulted Rachel, stating, "I don't think there's any issue on that. He assaulted her. To the extent that he assaulted her it raises the level of the offense called assault that you would probably want to find him guilty of. The issue is not whether he assaulted her." Instead, Dillon's counsel also focused on witness credibility. He argued that Dillon told the truth and pointed out Dillon's testimony about his confusion when arrested fifteen months later because he thought his brother or his father must be the one with the aggravated assault charge. He portrayed Kelli as a liar who was settling an old score with Dillon, stating, "Well, you knew that one

17

time this victim of her boyfriend's assault [by sword] held the keys to whether or not he went to jail or was prosecuted." And he portrayed Rachel as a manipulative, baby-killing liar. He also brought up Enrique's memory lapse about when Rachel mentioned the gun and the absence of any gun in the trial evidence.

In rebuttal, the State again argued that Rachel's testimony and Kelli's transcript matched, and that Kelli's transcript was reliable because she was Dillon's friend, not a cooperative witness for the State, and because she purported to remember nothing during the trial. The State argued, "If [Kelli] had [some] score to settle here, if she wanted to do some pay-backs to the Defendant, she would have been a whole lot more cooperative than she was," and it argued that the case was about Dillon being upset because he thought Rachel was pregnant with someone else's baby—not about his concern for the baby itself. The State finished by again attacking the credibility of the defense witnesses: Pete and Dillon's father, convicted felons who did not witness the actual incident, and suggesting that Dillon had plenty of time to "ditch the gun" between the time he left Kelli's house and arrived at his father's house.

The jury submitted several notes to the trial court during its deliberations. The first note requested a list of available evidence and the second requested to see the evidence: six photos of Rachel's injuries, the three boxes of bullets,

18

and one compact disk of Kelli's phone call with Detective Thomas.  The jury

also requested the time that Kelli's 911 calls were made[12] and Rachel's

testimony—specifically, "which gun Rachel was confused on the color of," and

"whether she was being asked about the gun used that night or a different

gun."[13]

---

[12] The jury requested this information several times.  The information provided in response to the jury's requests was from Kelli's cross-examination, in which she stated she did not remember when she made the 911 calls, and Detective Thomas's cross-examination, in which she testified that the 911 calls were made in the early morning hours of February 11 and showed that they came from Kelli's phone number.

[13] The trial court had the following portion of testimony read to the jury:

Question: Didn't you describe it as a silver possibly .380 automatic?

Answer:  Uh-huh.

Question:  When I asked you about the silver gun, you said you didn't remember and now you remember?

Answer:  No.  I said it was a silver gun he had.

Question: When?

Answer: He had it all the time.

Question: Except the night that he had a black gun?

Answer: Yes.

19

In its sixth note, the jury asked, "Do we all need to agree on the first point before we move on?" The trial court responded, "[p]lease refer to the Court's charge and be governed thereby." The jury subsequently requested, "DA testimony when he was reading Kelli's statement—starting when Det. Thomas ask[s] if she saw a gun." The trial court provided the entire transcript of Detective Thomas's phone conversation with Kelli. The jury also requested Enrique's testimony and Detective Thomas's testimony. The trial court read portions of Enrique's testimony about Rachel calling him twice and whether he remembered telling the police about the gun the first time he talked with them, the portion of Kelli's transcript about the black gun, and the portions of Kelli's transcript involving the 911 calls. The trial court had to instruct the jury several times that it could only give them portions of testimony for which there was a dispute about a specific point.

Based on all of the above, we conclude that the trial court's error in failing to include the requested Class C lesser included offense instruction caused no harm. The contested issues, based on the evidence and the arguments of counsel, revolved around witness credibility. Because the jury determines the weight to be given contradictory testimonial evidence, i.e., whether Dillon had a gun and whether he threatened Rachel with it, we cannot say that the failure to include a lesser included offense instruction on threats

20

alone harmed Dillon under the circumstances presented here. *See Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000) (requiring deference to the jury's determination of the weight to be given contradictory testimonial evidence). Further, Dillon admitted during testimony and defense counsel conceded during closing arguments that Dillon was guilty of assault as submitted in the Class A lesser included offense instruction. Therefore, if the jury had failed to find that Dillon threatened Rachel with a gun, however incorrectly the Class A instruction might have been included, they had no reason not to find him guilty of it. Based on the jury notes, the jury clearly deliberated upon the gun issue and ultimately concluded that Rachel's testimony was more credible than Dillon's on that point. Therefore, we overrule Dillon's second point. And because there was no egregious harm from the trial court's error by including the Class A charge, we overrule this point as well.[14]

---

[14] Because Dillon waived his objection to the Class A charge, this error is reviewed under the egregious harm standard. *See Almanza*, 686 S.W.2d at 171; *see also* Tex. Code Crim. Proc. Ann. art. 36.19; *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). Although the same factors are evaluated as in the previous analysis, egregious harm is the type and level of harm that affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory and the purpose of the review is to illuminate the actual, not just theoretical, harm to the accused. *See Almanza*, 686 S.W.2d at 171–72; *see also Allen*, 253 S.W.3d at 264 & n.15; *Olivas v. State,* 202 S.W.3d 137, 144, 149 (Tex. Crim. App. 2006). Had the jury convicted Dillon of Class A misdemeanor assault, Dillon would have suffered egregious harm

## IV. Conclusion

Having overruled both of Dillon's points, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, J.; CAYCE, C.J.; and DAUPHINOT, J.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 26, 2009

---

because that charge should not have been included as a lesser included offense. Because the jury convicted Dillon of aggravated assault with a deadly weapon as set out in the indictment, Dillon suffered no harm from the erroneous inclusion of the Class A instruction.