**AFFIRM; and Opinion Filed August 2, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-11-01729-CR
No. 05-12-00007-CR

**GEORGE WILLIAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F08-62218-U & F10-00781-U**

## MEMORANDUM OPINION

Before Justices Lang-Miers and Fillmore[1]
Opinion by Justice Lang-Miers

George Williams appeals his convictions for compelling prostitution. In three issues, he contends the evidence is legally insufficient to support his convictions, there was error in the jury charge for both cases, and the trial court erred by permitting testimony about juvenile prostitution. We affirm the trial court's judgments.

---

[1] The Honorable Mary L. Murphy was on the panel and participated at the submission of this case. Due to her retirement from this Court on June 7, 2013, she did not participate in the issuance of this Opinion. *See* TEX. R. APP. P. 41.1(a), (b).

## Background

On May 1, 2008, Dallas police officer Bervin Smith went with two other officers to the Montecito Creek Apartments to respond to a complaint that prostitution was occurring inside a particular apartment in the complex and in a parking lot and service road near the complex. The officers spoke with the property manager, who told them appellant lived in that apartment. The officers went to the apartment, knocked on the door, and spoke with the woman who answered the door. Smith described her as being around nineteen or twenty years old. The woman allowed the officers to enter the apartment. Appellant was not there at the time.

Smith noticed another person inside the apartment. He described that person as a "very young" female who was fifteen or sixteen years old. The officers were there in the morning during school hours, and Smith wondered why she was not in school. The officers discovered another female in the apartment. Smith also described her as looking "very young" and estimated that she was fifteen or sixteen years old. He specifically remembered that she did not look like she was an adult and, after he spoke with her, he could tell she was not an adult. Smith referred to the woman who answered the door as the "bottom girl," which he explained is the girl in charge of the other young girls, the "pimp's right-hand person." Smith said the "bottom girl" did all of the talking, and although the younger girls did a "little bit of talking," they kept looking to her before talking to the officers.

The officers saw indications that sexual activity may be occurring inside the apartment. For example, there was a mattress on the floor in the front room and a dildo was in plain view in a back room. They also found condoms in the back room. Smith explained that it is common for extra mattresses to be set up that way because "[t]hey're used to have sex with the johns the young girls or guys bring back to the apartment." Smith also observed several rows of "milk

crates" located in a corner. The crates contained clothing and personal items. Based on his experience, the crates made Smith think the apartment was a place for runaways. Smith stated the girls are given areas to temporarily store their possessions because they may not stay long in any one place.

The officers found out the names and ages of the two young girls and determined that the girls were runaways. Both girls, B.S. and A.G., were under seventeen years old at the time. They took the girls to the nearest juvenile facility because they were runaways but they were not placed under arrest for any other offenses.

James Bordelon, a detective with the High Risk Victims Unit, interviewed each girl separately at the juvenile facility. He said that "[b]oth girls indicated that they were brought into the prostitution game" by appellant, who was also known as "Selfish." According to Bordelon, the girls knew appellant by his full name and sight, and they knew where he lived. The girls provided written statements and separately identified appellant in a photo. B.S. also told Bordelon that appellant "had her place an ad in the 'Observer' for prostitution." B.S. provided the phone number and ad content as part of her written statement. Bordelon found the "Observer" ad and compared the information with B.S.'s statement. The ad was contained in an issue dated April 24 through April 30, 2008 and read "Barely Legal 19!!! Top or Bottom Special. 24 hours. N. Dallas Incall. Appointments necessary. Ask for Coco" and included a business and cell phone number.

Appellant was charged in two separate indictments with the offense of compelling prostitution of a person younger than seventeen years old. The complainant in cause number F08-62218-U was A.G., and the complainant in cause number F10-00781-U was B.S. The indictment in the first cause included an enhancement paragraph alleging appellant had been

previously convicted of the felony offense of possession with the intent to deliver a controlled substance. Appellant pleaded not guilty to both charges, and the case proceeded to a jury trial.

B.S. was nineteen years old at the time of trial. She testified she was fifteen years old and a student at the Dallas Can Academy when she met appellant but that she told appellant she was eighteen years old. B.S. said the first time she "hung out" with appellant, she told him that she was living with her grandmother, who was "struggling" to take care of her and provide things for school. Her parents were both drug addicts and did not take care of her. She testified that appellant told her about prostitution—"another way to make money." B.S. explained that appellant told her "the basics" of how he would keep her pretty, get her hair done, and how to "pull the tricks," referring to how she could get clients to stop and pick her up. B.S. testified that she did not get involved with prostitution the first day she met appellant and, although she had not been involved with prostitution before meeting appellant, B.S. thought it sounded like a good idea at the time.

Two or three weeks later, B.S. started "working" or "prostituting" for appellant. Appellant took her to get her hair and nails done, and he bought her clothes and heels that were kept at appellant's apartment. He also bought her condoms and a cell phone. B.S. testified that appellant gave her instructions on how to handle herself. He specifically instructed B.S. on what to do if she got pulled over by the police ("don't say anything") and how much money to charge for different sexual acts, telling her not to be "too greedy." Appellant also told her where and how to "walk" to attract dates and what to do when she got into someone's car. When she was "walking" at a location down the street from the apartment, appellant would drop her off at the location. She was supposed to "walk" until the condoms were gone.

B.S. also had customers come to appellant's apartment. Some of those customers called a phone "chat line." B.S. would give the customer the address of the apartment, and she would have sex with the customer on the mattress in the living room. People also called because of the "Observer" ad, which was paid for by appellant. B.S. knew about the ad because she went with appellant to place the ad.

B.S. never saw appellant go to work. She testified he got money from "[her] and the other girls." B.S. worked for appellant for three to four weeks and made between $200 and $300 for an evening's work. She said appellant kept track of how much money she made by the number of condoms that were left over. She explained that appellant valued each condom at either $50 or $100 and she had to bring back at least $50 for each condom that was missing. She said that all the money she made was appellant's money; "[a]fter he got the money, I don't know where it went." The only money she had was money appellant gave her. B.S. called appellant "Daddy" and described her relationship with appellant as "[l]ike a father and daughter relationship." B.S. explained that appellant made sure she had something to eat and bought her the things she did not have. She said she liked how appellant took care of her but that she did not like the "work."

B.S. testified that on the morning the police came to the apartment, she would not answer their questions about prostitution. She said that she lied and told them that she was there spending the night with "Sweets," the older girl. B.S. lied because she did not want appellant to get in trouble. She "figured if he got in trouble, we were too. We were there prostituting." She said her lie did not hold up because "[i]t was obvious." B.S. admitted that she also lied about appellant's name, testifying she made up a nickname for appellant because she did not want to give Bordelon appellant's real name. She further acknowledged that other things in her written

statement were not true but that she put them in her statement because she was afraid of being charged with prostitution. She agreed, however, that she made statements that could get her in trouble. She tried to lie to protect appellant, but because it was "obvious," there was "nothing [she] could lie and say to change anything."

A.G. also was nineteen years old at the time of trial. A.G. testified that when she met appellant she was living with her aunt and seven other children and did not have any spending money. She lived there because her stepfather molested her and her mother would not leave him. She did not get along with some of the other children. She went to school with B.S. and said B.S. talked to her about ways to get money for clothes and other things "16-year-old girls like." B.S. then introduced her to appellant.

The first time A.G. met appellant, he picked her up from school with B.S., and they went to appellant's apartment. A.G. remembered that on the way to the apartment they were talking about "ways to get money" and how if you "want nice things, you have to go out and get it." When she got to the apartment, she found out the way to "go out and get money" was by prostituting. A.G. testified that appellant gave her instructions on how to make money prostituting, such as instructing her on how to use condoms and "to basically be careful" because "dudes" may try to rob you or take you places. He also told her how much money to charge for specific sexual acts and how to wave to get dates. Appellant also took her shopping and bought her clothes and jewelry and paid to have her hair and nails fixed.

A.G. testified appellant gave her a quota of how much money she was supposed to make and that she would have to keep working until she reached the quota. She found dates on the street and also took dates back to appellant's apartment. Some dates would call and set up an appointment; she explained, "they set up a time and when and then they come over, and then you

tell them how much and then there it is." A.G. gave the money she collected from performing sexual acts to appellant, stating "[t]hat wasn't my money." A.G. testified that she worked for appellant from the first day she met him until the day the police came, which was a period of about two weeks. A.G. stayed at appellant's apartment during that time. Although she talked to appellant about going home, she never did. She testified that she did not leave the apartment because she felt like she had no other place to go. She explained that she had broken her aunt's strict rules by what she was doing and her aunt told her that if she could not follow the rules, she "had to get out of her house."

A.G. described her interview with Bordelon at the juvenile facility and the written statement she gave police. She said she felt embarrassed telling her story and acknowledged that prostituting was a bad choice. She also said she felt ashamed, guilty, and overwhelmed the day the police came. She admitted that she lied about her age and was uncooperative when the police came to the apartment. She said she was scared because she could be charged with prostitution and for being a runaway. She admitted to prostituting herself even though she knew she could get in trouble.

The jury also heard testimony from Byron Fassett, a sergeant in the Dallas Police Department Child Exploitation Squad. He testified about how "trafficking of children works" and how children like B.S. and A.G. seem to willingly get into prostitution. Fassett testified over defense counsel's relevancy objection that there is a misconception that the children are "willing participants" and "they freely choose to get into this." He stated that based on his experience, children "do not willingly choose to be involved in prostitution." He stated that this is his "personal belief" even if the child testified she was a willing participant or chose to prostitute voluntarily. Fassett emphasized that the main reasons a child gets involved in prostitution are

because he or she wants love, affection, attention, and a sense of belonging. The children are generally from dysfunctional homes, are chronic runaways, may have been physically or sexually abused, or have other problems at home.

Fassett also testified that he has been involved in child sexual abuse cases for twenty years. Fassett explained that when he interviews a child involved in prostitution, he starts with the perception that the child is being deceptive and avoiding his questions and that the child has been coached not to talk about it. He also explained that it is common for girls involved in prostitution to protect the pimp and "denial is the first level" of that protection. He stated, children "don't lie to get into trouble; they lie to get out of trouble." And ultimately, it is difficult for children to admit to prostitution because they are ashamed to admit that they sell their bodies for sex.

The jury found appellant guilty of compelling prostitution in both cases as charged in the indictments. Appellant pleaded true to the enhancement paragraph, and the jury assessed punishment at twenty years' confinement in one case and life in prison in the other case.

## Sufficiency of the Evidence

In his first issue, appellant challenges the sufficiency of the evidence to support his convictions. In reviewing a challenge to the sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found each element of the offense beyond a reasonable doubt. *See Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Id.* We defer to the jury's credibility and weight determinations, because the jury is the sole judge of the witnesses' credibility and the

weight to be given their testimony. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We presume the jury resolved all conflicts in the evidence in favor of the verdict. *Id.* at 326.

To prove beyond a reasonable doubt that appellant committed the offense of compelling prostitution, the State had to establish that appellant knowingly caused B.S. and A.G., persons younger than seventeen years of age, to commit prostitution. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1991 TEX. GEN. LAWS 3586, 3681 (statute in effect at the time of the offense, amended 2009 and 2011) (current version at TEX. PENAL CODE ANN. § 43.05(a)(2) (West Supp. 2012)). Prostitution includes offering to engage, agreeing to engage, or engaging in sexual conduct for a fee. TEX. PENAL CODE ANN. § 43.02(a)(1). "[T]he actual commission of the offense of prostitution is not a prerequisite to the commission of the offense of compelling prostitution." *Waggoner v. State*, 897 S.W.2d 510, 513 (Tex. App.—Austin 1995, no pet.) (citing *Davis v. State*, 635 S.W.2d 737, 739 (Tex. Crim. App. 1982)). Rather, "'one who *provides opportunity* for a willing minor to engage in prostitution and *influences, persuades* or *prevails upon her to do so* has . . . caused the prostitution . . . .'" *Id.* at 512 (emphasis in original) (quoting *State v. Wood*, 579 P.2d 294, 296 (Or. Ct. App. 1978)).

Appellant first contends the evidence is insufficient to show he compelled B.S. and A.G. to commit prostitution because the testimony of the girls was unreliable. He claims both girls had a motive to be untruthful and that they "fabricated the version of prostituting" for appellant. Appellant also maintains that two additional factors weigh against the determination that he compelled the girls to prostitute: the girls admitted that they voluntarily engaged in prostitution and he was not there on the day the police came to the apartment. Appellant argues that to have caused the girls to engage in prostitution, he "would have been around to monitor the activity as well as collect the money that was earned." We disagree.

Both girls testified that they learned about how to make money by prostituting from appellant. B.S. testified appellant told her the "basics" of how it is done and how he would "keep her pretty" so she could "pull the tricks"; appellant also instructed her on how to handle herself. A.G. testified that appellant instructed her on how to use condoms and to be careful; he also taught her how to get dates. Both girls testified appellant took them to get their hair and nails done, bought them clothes and high heels, and supplied them with condoms. B.S. also testified that appellant bought her a cell phone. Appellant instructed them on how much to charge for different sexual acts, provided his apartment as a place to take clients to have sex, and drove them to the locations where they could "walk" to pick up dates. B.S. also testified that appellant placed an ad for her in the "Observer" as another way to get dates. Both girls testified that they collected money for sexual acts they performed and that they gave all the money they made to appellant. A.G. stayed at the apartment during the two weeks she "worked" for appellant. Appellant also provided food for the girls, and B.S. testified that she received some "lunch money" from him. Both girls were under seventeen years old at the time. Although the girls testified that they chose to prostitute and did not consider themselves "working" for appellant, the girls also testified that they had never prostituted before, appellant taught them the "basics" of how to prostitute, provided them with the means to prostitute, and collected all the money they earned from prostitution.

Appellant's contentions that the evidence is insufficient because B.S.'s and A.G.'s testimony was unreliable and they made up the story about prostituting for appellant to protect themselves are without merit. These were factors for the jury to consider in assessing B.S.'s and A.G.'s credibility and determining the weight to be given their testimony. *Jackson*, 443 U.S. at 319. We afford almost complete deference to these determinations and are not permitted to

reevaluate the weight and credibility of B.S.'s or A.G.'s testimony or substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Viewing this evidence in the light most favorable to the verdicts, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant caused B.S. and A.G., girls under the age of seventeen, to commit prostitution. *See Waggoner*, 897 S.W.2d at 512–13 (evidence appellant provided thirteen-year old with contact, condom, and cell phone, negotiated price, and drove child to location was sufficient to support jury verdict of compelling prostitution). We resolve issue one against appellant.

**Jury Charge Error**

Appellant complains in his second issue that the trial court reversibly erred when it improperly defined the term "knowingly" in the court's charge for both cases. The trial court's written instructions to the jury were the same in both cases; the only difference in the two charges was the name of the complaining witness. The relevant portion of the court's charge read as follows:

> A person commits an offense [of compelling prostitution] if he knowingly causes by any means a person younger than 17 years to commit prostitution.
>
> . . .
>
> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to the circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Appellant argues that the offense of compelling prostitution is a result-of-conduct offense and that the trial court erred because it did not limit the definition of "knowingly" to the result of his conduct. He argues that his defense was that he was not responsible for compelling B.S. and A.G. into prostitution; rather, "they did it themselves." He claims that he was egregiously

harmed by the erroneous instruction because the evidence shows the girls were not credible and misrepresented to the jury that appellant was responsible for compelling them into prostitution. The State responds that even assuming there was error in the charge, any error was harmless. We agree with the State.

When, as here, there is no objection at trial, we will not reverse for jury charge error unless the record shows appellant suffered egregious harm as a result of any error. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). That is, appellant must show that the error deprived him of a fair and impartial trial. *Id.*; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). We assess harm in light of the entire jury charge; the state of the evidence, including contested issues and the weight of the probative evidence; the arguments of counsel; and any other relevant information revealed by the record as a whole. *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006).

We conclude that the jury charge as a whole appears to have cured any claimed harm. *See Hill v. State*, 265 S.W.3d 539, 544 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). As stated above, the jury was instructed that a person commits the offense of compelling prostitution if he "knowingly causes" by any means a person younger than seventeen years to commit prostitution. Similarly, in the application paragraph that immediately followed the complained-of definition, the jury was authorized to find appellant guilty of the offense if it found beyond a reasonable doubt that appellant "knowingly cause[d] [B.S. or A.G.], a person younger than 17 years of age to commit prostitution." Because "knowingly" was in front of the word "cause" in both the instruction and application paragraph, a juror could not mistake the requirement that "knowingly applied directly to causing another to commit prostitution." *Id.*

- 12 -

In addition, based on the evidence, the contested issues, the weight of the probative evidence, and the arguments of counsel, we conclude that appellant was not egregiously harmed by any error in the court's definition of the word "knowingly." Appellant relied on the girls' testimony that they chose to engage in prostitution on their own. His counsel argued to the jury that both girls were willing to do this and were not forced to do this. He attacked the girls' credibility and emphasized their testimony that appellant treated them "nice" and that neither girl thought about quitting. The State, on the other hand, presented evidence showing that appellant knew the result of his conduct was prostitution: appellant bought the girls clothes and heels, supplied them with condoms, taught them how to "pull the tricks," told them how much money to charge, placed an ad in the "Observer," provided an apartment for use with clients, and drove them to locations to walk. Appellant also collected the money they made. Both girls testified that they learned how to make money through prostitution from appellant and, even though they lied to the police when first questioned, they told the officer that it was appellant who brought them into the prostitution "game."

We conclude that whether or not there was error, no harm resulted because the trial court did not limit the definition of "knowingly" to the result of appellant's conduct. We resolve issue two against appellant.

### Admission of Fassett's Testimony

Appellant argues in his third issue that the trial court erred by allowing the State's witness, Dallas police sergeant Byron Fassett, to testify regarding the misconceptions about juvenile prostitution. Appellant's only objection was that Fassett's testimony was not relevant. We review a trial court's ruling on the admissibility of evidence for an abuse of discretion and will reverse only when the trial court's decision was so clearly wrong that it lies outside the zone

of reasonable disagreement. *Hayden v. State*, 296 S.W.3d 549, 553 (Tex. Crim. App. 2009); *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009).

Fassett testified that he was an expert in child exploitation and the prostitution of children. He formed a specialized unit within the department that only deals with children involved in trafficking. He explained that the unit is specialized because child trafficking cases bring a lot of challenges and require different investigation and interviewing techniques. He also explained that the members of the unit understand the perceptions about child prostitution and how to find the kids that are involved in prostitution.

Fassett testified that based on his twenty years of experience in these types of cases, he learned that certain children get involved in prostitution because they come from dysfunctional homes and most of them are chronic runaways. Fassett testified that these children are more vulnerable. They are brought in by the pimp, "bottom girl," or another girl, are given food and shelter, and lavished with attention. The children are then told that if they want to stay, have a place to live, and be safe, "then you have to start doing this." They are sold on the idea that it is a "great lifestyle" and taught to protect the pimp. They are also taught to lie about it.

Fassett also testified that there is a misconception that these children are willing participants; he stated that based on his experience, children do not willingly choose to be involved in prostitution. Fassett said the children get caught up in the "game" because they perceive they are getting love, affection, and a sense of belonging; they have shelter, security, and get their nails and hair done; and they see "a lot of flash" and money. During cross-examination, Fassett stated that it was his "personal belief" that B.S. and A.G. did not willingly volunteer to prostitute even if they testified that they were willing to do so.

At trial, appellant objected to Fassett's testimony, contending that it was not relevant. He specifically objected to Fassett's testimony about misconceptions people have about juvenile prostitution (that the child is a willing participant) and the perception that the child is getting something out of the prostitution "game." He also argued, after questioning Fassett on voir dire, that Fassett's testimony was not relevant because Fassett did not have any independent knowledge of how B.S. and A.G. got involved in prostitution; Fassett was familiar with the facts of the case only through his review of the case file. The trial court overruled his objections.

Appellant contends on appeal that Fassett's testimony concerning "the mindset of a juvenile prostitute, why they do it, the characteristics of a typical child victim, and how the organization is structured" was not probative of whether appellant knowingly compelled B.S. and A.G. to prostitute but rather was used to bolster B.S.'s and A.G.'s credibility. He claims the admission of this testimony "affected his substantial right that his guilt be based upon his conduct and not some inflammatory opinion of the detective." We disagree.

"Relevance is 'a looser notion than reliability' and is 'a simpler, more straight-forward matter to establish.'" *Tillman v. State*, 354 S.W.3d 425, 438 (Tex. Crim. App. 2011) (quoting *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)). To determine relevance, we ask whether the evidence will assist the trier of fact and "is sufficiently tied to the facts of the case." *Id.* There is no requirement that the expert have personal knowledge of the facts for his testimony to be relevant. *See, e.g.*, *Jordan*, 928 S.W.2d at 556 n.8 (noting expert can offer opinion based solely on hypothetical questions posed at trial); *Cohn v. State*, 849 S.W.2d 817, 819–20 (Tex. Crim. App. 1993) (holding expert psychological testimony about characteristics commonly displayed by child victims of sexual abuse admissible because linked to facts of case

by testimony of other witnesses). To be relevant, the expert must tie pertinent facts of the case to the principles which are the subject of his testimony. *Tillman*, 354 S.W.3d at 438.

Appellant's defensive theory at trial was that he did not compel either B.S. or A.G. to prostitute. And both girls testified they chose to engage in prostitution on their own. To address the issue, the State offered Fassett to testify about child trafficking and help the jury understand how children like B.S. and A.G. get into a situation where they are seemingly willing to engage in prostitution. The State's questions drew directly from Fassett's experience interviewing children, and the specialized knowledge he had—who these children are, how they get involved in prostitution, and why they lie about it—mirrored testimony from B.S. and A.G. concerning their backgrounds, what appellant did for them, and how they lied to protect appellant. Fassett's testimony was sufficiently tied to the facts of the case to be relevant. *See id.*; *Cohn*, 849 S.W.2d at 818–20.

We conclude that the trial court did not abuse its discretion in allowing Fassett to testify concerning juvenile prostitution. We resolve appellant's third issue against him.

Having decided appellant's three issues against him, we affirm the trial court's judgment in both cases.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

111729F.U05

- 16 -



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GEORGE WILLIAMS, Appellant

No. 05-11-01729-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F08-62218-U.
Opinion delivered by Justice Lang-Miers.
Justice Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 2nd day of August, 2013.

/Elizabeth Lang-Miers/

ELIZABETH LANG-MIERS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GEORGE WILLIAMS, Appellant

No. 05-12-00007-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas
Trial Court Cause No. F10-00781-U.
Opinion delivered by Justice Lang-Miers.
Justice Fillmore participating.

    Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 2nd day of August, 2013.

/Elizabeth Lang-Miers/

ELIZABETH LANG-MIERS
JUSTICE